David **EASTHAM**, Petitioner,

v.

Perry M. **JOHNSON**, Warden, Respondent.

Civ. A. No. 36204.

United States District Court, E. D. Michigan, S. D.

Feb. 2, 1972.

---

Condit, Denison, Porter & Bartush, Bloomfield Hills, Mich., for plaintiff.

Peter Houk, Asst. Atty. Gen., Lansing, Mich., for defendant.

## MEMORANDUM AND ORDER

DeMASCIO, District Judge.

Petitioner, David Eastham, was sentenced to a term in the State Prison for Southern Michigan at Jackson for the crime of uttering and publishing. He exhausted his state remedies and then brought this Habeas Corpus petition under 28 U.S.C. § 2254 alleging deprivation of his Sixth and Fourteenth Amendment rights. Specifically, petitioner alleges he was denied his right of confrontation.

At petitioner's preliminary examination,[1] a witness, Linda Wilkins, testified

---

1. The Michigan preliminary examination is a pretrial procedure where a Magistrate hears testimony in order to determine whether there is sufficient evidence to hold the defendant for trial.

that she cashed stolen checks on which the petitioner had typed her name. She further testified that after cashing these checks amounting to more than $3,000.-00, she returned the money to the petitioner. The petitioner, she testified, then gave her $200.00 and an automobile and instructed her to leave the state.

Miss Wilkins traveled to California where she was arrested for fraudulent use of another's credit card. She waived extradition proceedings and returned to Michigan. When interviewed by the Pontiac police, she implicated petitioner. Several days after his arrest, she testified at his preliminary examination as recited above and was cross-examined by petitioner's attorney. The petitioner was subsequently bound over for trial, and Miss Wilkins was endorsed as a witness upon the information. Sometime after petitioner's hearing, Miss Wilkins plead guilty to her complicity in the offense and was released on bond to await sentence. She never returned.

At petitioner's trial, the prosecution did not produce her as a witness. Instead, the prosecution called Detective Martinez who testified that he made several attempts, including a visit to her last known address, to serve Miss Wilkins with a subpoena, but to no avail. He found her apartment vacant. He testified that he talked to people in the downstairs apartment and they informed him that Miss Wilkins had moved. Detective Martinez could not relate what he had further learned from other interviews because the trial judge sustained defense counsel's objection to such testimony on the grounds of hearsay. Petitioner obtained an affidavit from Detective Martinez and attached it to his petition. In this affidavit, Detective Martinez stated he had heard Miss Wilkins left the State for California before petitioner's trial. He did not attempt to locate her in California nor contact the authorities there.

The trial court, without the benefit of the facts mentioned in this affidavit and based solely upon the Detective's testimony at the trial, held that "every effort has been exercised to attempt to serve Miss Wilkins with a subpoena and the police force used reasonable effort to serve her." Thereupon, the prosecution was permitted to use the transcript of Miss Wilkins' testimony given at the preliminary examination. The petitioner was thereafter found guilty and sentenced. The Michigan Court of Appeals found no abuse of discretion in admitting the transcript. The Michigan Supreme Court denied petitioner's Leave to Appeal. The petitioner now maintains that the use of this transcript at his trial deprived him of his sixth amendment right of confrontation.

■ There are circumstances when prior recorded testimony is admissible in a criminal trial without violation of defendant's right of confrontation. Our Supreme Court has said:

"It is true that there has traditionally been an exception to the confrontation requirement where a witness is *unavailable* and has given testimony at previous judicial proceedings against the same defendant *which was subject to cross-examination by that defendant.*" Barber v. Page, 390 U.S. 719, 722, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1968) (emphasis added).

■■ There is no question that petitioner's attorney cross-examined Miss Wilkins at his preliminary examination. If she were "unavailable" for trial, use of her prior testimony would have been proper. Barber v. Page, supra. The test to determine "unavailability" is whether the prosecution can demonstrate a "good faith effort" to obtain the presence of the witness at trial. To resolve this inquiry, we conducted a hearing to supplement the record for a proper determination of this witness's "unavailability" and to test the effort made by the prosecution.[2]

The court concludes that the prosecution here made a "good faith effort" to locate Miss Wilkins for trial and that

---

2. Portions of the transcript of that hearing are appended.

she was, therefore, "unavailable." Miss Wilkins was unknown to the local police until their investigation disclosed her connection with the passing of fraudulent checks. In the midst of that investigation, California authorities contacted the Pontiac Police Department to routinely inquire whether she was wanted by the Michigan authorities. California was advised to hold her for the Pontiac authorities. Miss Wilkins waived extradition and was returned to Michigan in police custody. While under arrest here, Miss Wilkins implicated the petitioner.

■ To locate Miss Wilkins for trial, Detective Martinez contacted her neighbors in the apartment building where she lived and learned that she had moved sometime prior to his visit. Further, he talked to the landlord who advised him that he had been looking for Miss Wilkins to collect past-due rent. The landlord said that he did not know where she could be located. Her parents and her sisters did not know her whereabouts.[3] Detective Martinez testified that he even checked with the Pontiac school system to determine if any of Miss Wilkins' children were registered in school.[4]

The court does not feel Detective Martinez could have done anything more that would have been meaningful. He reported that Miss Wilkins' sister did say she "seemed to think" Miss Wilkins went to California. Without a specific city or community in California, it would have been pointless to continue the search.

■■ Petitioner argues that Barber v. Page, supra, and Berger v. California, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969) are controlling.[5] In both Barber and Berger a specific address for the witnesses was known to the prosecution. Barber v. Page discredited the old concept that a mere showing by the prosecution that a witness was in another state would constitute "unavailability" so as to justify the use of a transcript at a defendant's trial. Since Barber v. Page, the prosecution must do more than just show the witness is out of the jurisdiction of the state where the defendant is being tried. Where the prosecution knows the specific location of a witness who is out of the state, the prosecution must subpoena the out-of-state witness under the "Uniform Act to Secure the Attendance of a Witness from Without a State" if such a statute is available.

■ The determination of "good faith effort" by the prosecution is a factual question to be determined in the light of the circumstances in each case. People v. Peters, 276 Cal.App.2d 71, 80 Cal.Rptr. 648.[6] Here, it appears from all

---

3. Detective Martinez was not permitted to relate any of the information he obtained from these interviews. The prosecution stopped the witness in compliance with the court's ruling. We believe the testimony was admissible since it was offered to show "state of mind" on the issue of "good faith effort" and was not offered to prove the truth of the information obtained.

4. Detective Martinez testified he went to the Child Accounting Office for the entire Pontiac school system in an effort to locate children with the surname Wilkins.

5. Berger gives retroactive application to Barber v. Page.

6. After our ruling, counsel for petitioner directed the court's attention to the latest Michigan Supreme Court case of People

v. Tees, 192 N.W.2d 241. In People v. Tees, the prosecution acting under the old concept of "unavailability" merely established that a witness was in the U.S. Navy. The court permitted the witness to be treated as "unavailable" because he was not in the jurisdiction of Michigan. The Michigan Supreme Court treated Barber v. Page and Berger v. California as controlling and set aside the defendant's conviction because the prosecution did not make a "good faith effort" to attempt to obtain the witness's return from the Navy. People v. Tees is not controlling here. Trying to locate the witness Linda Wilkins without a known address is quite a different matter than seeking the return of a witness who was definitely known to be in the U. S. Navy. The record of an individual in the U. S. Navy is a start for taking steps to assure the return of the individual. In the case

the facts that the prosecution did not definitely know that Miss Wilkins was in California and they did not have a specific address for her. Under the circumstances, the prosecution did in fact make a "good faith effort" to locate her. All the interviews conducted by Detective Martinez failed to disclose any solid hint as to Miss Wilkins' whereabouts. It was the petitioner who first sent her forth on her journey. The petition is denied.

It is so ordered.

## APPENDIX

EXCERPTS FROM EVIDENTIARY HEARING, DECEMBER 13, 1971 DAVID EASTHAM v. PERRY M. JOHNSON, WARDEN—CIV. NO. 36204

Q: Do you know the nature of how she was contacted and how she was produced as a witness? (At examination.)

A. I don't recall. I think she was subpoenaed. I don't recall.

Q. Wasn't she returned from California for that preliminary examination on an extradition proceeding?

A. No, she was not.

Q. Wasn't she arrested in California and waived extradition?

A. She was served. She was not brought back to Michigan for the sole purpose of testifying.

Q. But she was arrested for a charge growing out of the same case in California, isn't that correct?

A. No, it is not correct.

Q. Would you explain?

A. This case grew out of that case.

COURT: Give the court all of the facts.

WITNESS: She was passing the checks and through the investigation of these checks Mr. Eastham got involved. So then she was being returned and then

before us, there was no address for Linda Wilkins. The prosecution did not know

through checking we were able to procure a warrant for Mr. Eastham.

Q. Where was she returning from?

A. California, I recall. I don't recall the city.

COURT: Excuse me, let me see if I understand. There was an investigation ensuing concerning the writing of some checks, false and fraudulent or forged checks. You were investigating the uttering and publishing of some of those?

A. Yes.

COURT: In connection with that investigation this witness was arrested in California?

A. Yes.

COURT: There was a case pending in Pontiac, Michigan, on some checks against her and she was brought back from California?

A. Yes.

COURT: Extradited—is that what you said?

A. She waived extradition.

Q. Now Detective when you were making your investigation in Pontiac, how did you learn that Linda Wilkins was in California?

A. We had received a teletype from the California authorities requesting whether there were any warrants on this person or any other information. It just happened that we were investigating these checks and she was identified and it was a matter of getting the warrant and we advised them that she was wanted by Pontiac.

Q. Did you find out where she was going to stay after the case was dismissed? Did you get her address?

A. Yes. I had several addresses on her.

that she in fact was residing somewhere in California.

Q. Did you ask her to stay in the State of Michigan?

A. I may have, I don't recall.

Q. What did you do?

A. I went to her last address on State Street in the City of Pontiac; was informed by the neighbors and in the apartment building that she no longer lived there. I checked with the landlord, Mr. Wright. He told me that he was also interested in her because she was back on the rent or owed him some rent. But he did not know her whereabouts. I checked with a Mrs. Price that lived on Perry Street in the City of Pontiac and she told me that she did not know her whereabouts. Mrs. Price was a good friend of hers. I checked with her parents who moved from the City of Pontiac, who retired up north to St. Haleron, one of those towns up north, and they told me that they did not know where she was.

Q. Did you have an idea where she was?

A. No. I later talked to her sister the same day whenever it was and she seemed to think that she did go to California.

Q. All right, so you did have some information that she may have gone to California?

A. Yes sir.

Q. Did you do anything about that information with regard to contacting the California authorities?

A. No sir. I talked to the prosecutor and they didn't think we should do anything.

Q. That was the end of it?

A. The end of it until we started to go to court.

Q. Was anything further done to locate Miss Wilkins?

A. No sir.