622 A.2d 160

**Larry Allen BREEDEN**

v.

**STATE of Maryland.**

**No. 740, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

April 1, 1993.

**482**

George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), both of Baltimore, for appellant.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Kreg Paul Greer, Asst. Atty. Gen.,

Baltimore, and M. Kenneth Long, Jr., State's Atty., for Washington County, Hagerstown, on the brief), for appellee.

Argued before MOYLAN, BLOOM and HARRELL, JJ.

HARRELL, Judge.

This case involves the admission of prior testimony of an allegedly unavailable witness. At his first trial, facing a charge of first degree murder, Larry Allen Breeden, appellant, admitted guilt to second degree murder but pleaded that he was not criminally responsible by reason of insanity. The Circuit Court for Washington County found that Breeden was criminally responsible and sentenced him to twenty-five years imprisonment. We vacated that judgment of criminal responsibility and remanded the case for a retrial of the issue because the trial judge failed to advise Breeden of his right to a jury determination of his criminal responsibility. *Breeden v. State*, 87 Md.App. 508, 590 A.2d 560 (1991).

At the beginning of the second trial, the State orally moved to introduce the transcribed testimony of a psychologist who had testified for the State at the first trial. The circuit court granted the motion over Breeden's objection. Accordingly, at trial, the State read the missing witness's testimony to the jury. Subsequently, the jury found Breeden to be criminally responsible for the murder. Breeden now appeals, claiming that the trial court erred when it declared the witness to be unavailable and allowed the State to use the witness's prior recorded testimony. He also contends that, notwithstanding that testimony, the evidence was sufficient to establish that he was not criminally responsible.

We conclude that the State did not make an adequate showing of unavailability because it did not make a reasonable, timely attempt to secure the presence of the witness, whose location was known, by using the procedures of the Uniform Act to Secure Attendance of Witnesses from With-

out a State in Criminal Proceedings (the Uniform Act or the Act) when it became apparent that the witness would not voluntarily appear at trial. Because the testimony was important to the State's case in rebutting Breeden's claim that he was not criminally responsible, the error was not harmless. Therefore, we reverse the judgment as to criminal responsibility.

## FACTS

Appellant pleaded guilty to strangling to death his friend, Shirley Baker, on 11 February 1989. He also pleaded that he was not criminally responsible for that act, but the trial judge determined otherwise at the first trial. As we have stated, we vacated the judgment of criminal responsibility because the trial court failed to inform appellant of his right to a jury trial on that issue. Subsequently, having been properly advised of that right, appellant elected to have a jury hear his second trial on the issue of his criminal responsibility. He then had the burden of convincing the jury that he was not criminally responsible for the murder.[1]

At the second trial, both sides presented extensive testimony. A review of the events surrounding appellant's arrest and of the days immediately thereafter will help put the expert testimony regarding the issue of appellant's criminal responsibility into perspective. Officer Brenton Saur of the Hagerstown Police Department testified that on 12 February 1989 he observed appellant attempting to enter the police department building through a locked employees'

---

**1.** Section 12–109(b) of the Health–General Article (1990) places on the defendant "the burden to establish, by a preponderance of the evidence, the defense of not criminally responsible." Maryland's test for criminal nonresponsibility by reason of insanity is set forth in § 12–108(a):

(a) *Test—In general.*—A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity:

(1) To appreciate the criminality of that conduct; or

(2) To conform that conduct to the requirements of law.

entrance. When Saur asked appellant if he needed help, appellant replied, "There's a dead woman in my apartment." After following appellant to his apartment, Saur found the body of Shirley Baker in appellant's bed. Saur further testified:

> I asked if Mr. Breeden had hurt the lady and he replied, "I put a rag over her face." I asked him what happened. He stated, "She had trouble breathing. I tried pushing on her chest. I gave her mouth to mouth. She was unconscious and I left." I asked, "You left?" And he responded, "I ran."

Saur further stated that during the time appellant was transported to the police station and "booked," appellant was "quiet," "sullen," and "subdued."

Jean Marie Cline was employed as a licensed practical nurse at the Washington County Detention Center when she first encountered appellant at the facility on 14 February 1989. She testified that he appeared to be nervous and depressed, and was reluctant to communicate with her. She also testified that when she attempted to give appellant his prescribed medication the next evening, "he backed away and I tried to show him the medicine and encourage him to take it and he exhibited very strange behavior. He told me that it was not his medicine and that I was trying to kill him." Cline also stated that appellant's fear seemed sincere and that his behavior was "mentally abnormal." She added that on occasion she observed and heard appellant speaking while he was alone in his cell.

Corporal Jerry Landsman, Jr., of the Hagerstown Police testified that he went to see appellant at the detention center on 15 February 1989 with a court order to obtain blood and saliva samples. He testified that appellant "was extremely high strung, nervous. He was wringing his hands. He was very reluctant to allow us to complete the court order. He was afraid of the needles. He was afraid of basically everyone." Landsman stated that the appellant needed constant reassurance that Landsman, the nurse, and

the detective who accompanied the officer were not going to hurt him.

## Appellant's Case

Appellant presented evidence of his mental health before and after the crime through both lay and expert testimony.

Carol Ann Breeden is appellant's daughter. She saw her father several times a week between Thanksgiving of 1988 and February 1989. She testified that during this period, appellant became very paranoid and thought that "somebody was out to get him." She further testified that appellant said that the buildings surrounding his apartment were emitting poison and that appellant unplugged televisions, microwaves, and other appliances to prevent electricity from getting into the house.

Margie Griffith, a close friend of appellant's for twenty years, also testified about appellant's behavior in the weeks leading up to his crime. She recalled that appellant was acting strangely and that he "wasn't Larry." Also, appellant told Griffith that someone was out to kill him. Griffith testified about appellant's physical appearance. She stated that appellant was "disoriented," and progressively likely to be uncharacteristically unshaven, with his shirt untucked and hair uncombed.

Another friend, Ralph Gossard, related that appellant said that he felt and heard "waves" coming from the ceiling of Gossard's house and insisted on unplugging appliances. Appellant told Gossard that someone was out to get him. Gossard also testified that appellant's personal appearance was no longer as neat as it used to be.

Linda Murray, who lived with Gossard, was also a friend of appellant. She, too, testified that appellant felt and heard waves emanating from the walls and ceiling, and that he often unplugged appliances in Gossard's house. She recalled that appellant stated that someone wanted to kill him, and that he was very nervous and paranoid in the weeks leading up to the crime. Like Griffith and Gossard,

Murray noticed that, during this period, appellant's personal appearance became increasingly disheveled.

Elaine Nahai first met appellant in 1987 when she worked at the Frederick County Mental Health facility. Appellant had voluntarily contacted the facility. Nahai testified that a psychiatrist at the facility diagnosed appellant as having "schizophrenia, paranoid type." Nahai conducted individual therapy sessions with appellant on an outpatient basis. These sessions were discontinued in May 1988 because appellant was no longer having "paranoid ideas," was taking his medication regularly, and was interacting better with people. Nahai met with appellant again on 12 January 1989 and testified that

> [h]e was quite fearful. He talked about things disappearing from his apartment which he was worried about. He talked about smelling like ammonia or burning flesh and about taking three or four showers daily. He talked about how his stomach would contract so much that his pants fall off. He talked about how he felt that he was going to die soon.

In addition to the above lay testimony, appellant presented three expert witnesses to testify on his behalf. First, Dr. Christiane Tellefsen testified as an expert in psychiatry. Her first contact with appellant came two months after the murder, when he was admitted to the Clifton T. Perkins Hospital Center (Perkins Hospital), where she was Acting Superintendent. She observed appellant from April to June 1989, and again when he was readmitted to the hospital in August 1989. In her opinion, appellant was not criminally responsible for the murder of Shirley Baker because he suffered from schizo-affective disorder. Dr. Tellefsen testified that this disorder consists of schizophrenia and manic-depressive illness. She testified that manic-depressive illness is a mood disorder in which a person's mood ranges from extreme depression to extreme elation. Schizophrenia, she explained, is a brain disorder that affects how a person thinks and expresses emotion. An exacerbated form of schizophrenia is psychosis, which generally has three

symptoms: hallucinations, delusions, and marked changes in behavior. Dr. Tellefsen testified that delusions are "fixed false belief[s] not supported by reality." She believed that the lack of a rational motivation for killing Shirley Baker was significant evidence of a connection between appellant's disorder and his incapacity to appreciate the criminality of his conduct. She explained:

We have quite a bit of evidence from family members and from Mr. Breeden's friends and from his prior psychiatric records that Mr. Breeden had developed a paranoid delusion. That is a delusion people are out to get him. Just prior to the offense and we had some evidence that pointed to Mr. Breeden's delusion incorporating the victim. That is he believed that Shirley Baker was somehow involved in the Mafia or maybe she was involved in doing things with his apartment or changing his possession[s] around in his apartment. But she was in some way involved in this conspiracy of people who were out to get him. And we had that information pointing to that motive for the offense and we had no information pointing to any other kind of motive for the offense.

. . .

[H]e felt like he was going to be killed. He felt like people were after him, out to get him, trying to poison him, trying to bombard him with some type of radioactive waves. People were persuing [sic] him, watching him. He was under surveillance and when he suffocated Miss Baker at that moment he felt that she was part of this conspiracy.

When asked if she thought that appellant was "malingering"[2] when she observed him at Perkins Hospital, Dr. Tellefsen opined that he was not. In her view, appellant's

---

**2.** Dr. Tellefsen testified that "[m]alingering is the fancy medical term for faking. So we see a fair amount of people who have been charged with a crime who will come in and pretend to be sick or crazy because they think that this will somehow excuse their behavior or get them off."

extensive history of mental illness was entirely consistent with the behavior he exhibited after the crime.

Next, Dr. Laurence J. Raifman testified as an expert in psychology. He was Director of Psychology and Co–Director of Forensic Services at Perkins Hospital. Like Dr. Tellefsen, Dr. Raifman believed that appellant suffered from schizo-affective disorder and, therefore, lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. He stated that appellant's increasingly erratic behavior in the weeks before the killing was consistent with schizo-affective disorder and demonstrated a steady progression of the disorder into a more acute, prominent phase. He believed that appellant became "out of touch with reality," explaining that

> [appellant's] mental disorder was such that it put him in a position that he was extremely ambivalent and confused with regard to his relationship to the victim at that moment. On the one hand he cared for her and he knew that she cared for him. On the other hand he feared from her that his life was in jeopardy....
>
> . . . . .
>
> He seemed to care for her in death but he was so fearful of her in life. Prior to and up to the time of the killing there was fear predominating. Immediately following the killing the ambivalence showed itself in that he immediately moved over to a more caring perspective....
>
> . . . . .
>
> [H]is actions appeared to indicate that he was not quite clear whether she was alive or not. He put her back in the bed. He pulled the covers up to her ... put her hands.... He took her dentures out and almost created an atmosphere as though she were sleeping in his bed. Leaving and then coming back to determine in fact if she was alive or dead.

Dr. Raifman also rejected the notion that appellant was malingering, noting that his history and prior conduct were consistent with the diagnosis of schizo-affective disorder.

Dr. Neil Blumberg testified as an expert in psychiatry. He also was of the opinion that appellant was not criminally responsible for the murder of Shirley Baker, though his diagnosis of appellant's illness was slightly different from the previous two experts. He concluded that at the time of the murder appellant was suffering from "schizophrenia, paranoid type which was chronic but in acute exacerbation." According to Dr. Blumberg, this disorder differs from schizo-affective disorder only in that it makes the patient's mood a secondary consideration.[3] Like Drs. Tellefsen and Raifman, Dr. Blumberg emphasized appellant's paranoid delusions as the primary characteristic of his illness:

> I think here there's a very clear link between his delusional beliefs, his confused thinking at that time, his hallucinations, the involvement of Shirley Baker in the delusional theme and his actions, his basically killing her thinking that she is part of a plot to harm him.
>
> . . . . .
>
> And what . . . I've come to the opinion of is that he knew that he was strangling or suffocating Shirley Baker, he knew he was ending her life but he didn't know and didn't appreciate that what he was doing was wrong. He was acting as if Shirley Baker was part of a conspiracy to harm him. And in his own mind was doing something that was justifiable, that was right and it was not wrong.

### State's Case

In addition to offering the testimony of the police officers involved in appellant's arrest, the State presented the testimony of two experts. First, over appellant's objection, the State read to the jury the transcript of the testimony given

---

**3.** Dr. Blumberg analogized the distinction between the two disorders to "a debate as to whether Lou Gehrig or Joe DiMaggio was a better baseball player."

by Dr. Mario Torres at the first trial. Dr. Torres had testified as an expert in psychology. He was a staff psychologist at the Perkins Hospital and first met appellant in May 1989. Dr. Torres concluded that appellant: (1) had "an organic mental disorder n.o.s. which means not otherwise specified," with evidence of alcohol dependence and marijuana abuse; (2) had "a personality disorder, n.o.s., ... with passive aggressive and dependent features"; and (3) was malingering. Based on these diagnoses, he believed that appellant was criminally responsible for the murder. Dr. Torres thought that appellant's case was a difficult one, but concluded that there was not enough evidence of a connection between appellant's mental illness and his behavior at the time of the murder.

Dr. Torres attached little weight to the descriptions of appellant's behavior in the three months before the crime because, in his view, appellant was not "reliable" or consistent in exhibiting or reporting the symptoms he claimed to have experienced. He also found significant the lack of an increased hostility by appellant in the time immediately before he strangled Ms. Baker. Because appellant's actions, especially after the crime, were "bizarre" but not characteristic of a "true psychotic," Dr. Torres thought that appellant was malingering. He testified that malingerers can fake bizarre behavior, but not psychotic behavior. On cross-examination, Dr. Torres admitted that there were numerous documented reports and other historical evidence of appellant's mental illness that were inconsistent with a diagnosis of malingering. This evidence, however, did not change his opinion.

Dr. Faramarz Mokhtari also testified for the State, as an expert in psychiatry. Unlike Dr. Torres, Dr. Mokhtari delivered his testimony in person. He was the Acting Clinical Director at Perkins Hospital. His expert opinion was that appellant was criminally responsible. He believed that appellant suffered from alcohol abuse and dysthymia, a disorder that is a type of continuous depression. Dr. Mokhtari testified that a dysthymic person does not experience

psychosis or exhibit psychotic behavior. He also believed that appellant was malingering. Like Dr. Torres, however, Dr. Mokhtari admitted that there were records and diagnoses dating back to 1987 that were inconsistent with his conclusion that appellant was malingering.

Appellant attempted to impeach Dr. Mokhtari's testimony on rebuttal. He recalled to the stand Dr. Tellefsen, who read Dr. Mokhtari's treatment notes for appellant for 24 September 1989. Those notes indicated that Dr. Mokhtari believed that there was "a possibility of paranoid psychosis," and that he prescribed Haldol to deal with that possibility. Dr. Tellefsen testified that Haldol is an anti-psychotic medication. And when asked about the disorder of dysthymia, she explained that "[b]y definition[, dysthymic patients] cannot have psychotic symptoms such as delusions and hallucinations. If they do have those symptoms, they do not have dysthymia."

## The Absence of Dr. Torres

As indicated, Dr. Torres testified for the State at the first trial on criminal responsibility in January 1990. On the morning of the second trial, 6 January 1992, the State orally moved to allow the introduction of the prior testimony of Dr. Torres on the basis that he was unavailable as a witness.

In support of the State's motion, the State's Attorney for Washington County recited to the court the prosecution's efforts to locate and secure Dr. Torres's attendance at trial. He related that in early November 1991 he learned that Dr. Torres no longer worked at the hospital. The hospital staff provided the prosecutor with the address of Dr. Torres's parents in Puerto Rico. On 6 November 1991, the State mailed a letter to Dr. Torres, in care of his parents, asking him to contact the Washington County State's Attorney's Office to discuss the possibility of testifying at appellant's second trial. There was no response. On 26 November, the State sent another letter to the same address; again, there was no response. Then, a member of the State's Attorney's

Office composed a letter in Spanish, asking Dr. Torres to contact the office. The State mailed this letter on 16 December, again in care of Dr. Torres's parents at their address. Dr. Torres called the State's Attorney's Office on 27 December, which was a Friday. He informed an assistant state's attorney that he was residing in a monastery in Puerto Rico and in the process of becoming a Jesuit priest. He further advised that, after a discussion with the head priest, he learned that he would not be available until August 1993.

On the following Monday morning, 30 December, the State informed the trial court of its efforts to secure Dr. Torres's presence at trial. The prosecutor was asked if he had attempted to use the Uniform Act. When he answered in the negative, the court advised him to do so. The State's Attorney's Office contacted the United States Department of Justice in Puerto Rico on 31 December and was advised of the appropriate court in Puerto Rico to which the subpoena for Dr. Torres should be sent. The State mailed the appropriate paperwork via Federal Express, which was to have delivered the paperwork on 2 January 1992. The State's Attorney's Office, as of the morning of trial on 6 January, had not received a response to its Uniform Act request. The record does not disclose that the State's Attorney's Office made any effort to inquire what the authorities in Puerto Rico did with its request.

In the meantime, an assistant state's attorney attempted to contact Dr. Torres by telephone on Monday, 30 December 1991. First, he called the monastery where the doctor was living. Someone at the monastery told the assistant state's attorney that Dr. Torres had gone to spend the weekend with his family, and gave the attorney the family's phone number. When the attorney called the number, he spoke with someone who said that he was Dr. Torres's father. That person stated that he would ask Dr. Torres to call the assistant state's attorney. That call never came, and the State decided to rely on Dr. Torres's prior transcribed testimony.

## DISCUSSION

### I

Appellant asserts that the circuit court committed reversible error when it permitted the State to read into evidence the transcript of the testimony given by Dr. Torres at the first trial on criminal responsibility. The heart of this alleged error is the court's finding that the State had established Dr. Torres's unavailability.

### A

 Introduction in evidence of prior recorded sworn testimony involves the right of confrontation under the Sixth Amendment to the United States Constitution[4] and Article 21 of the Declaration of Rights of the Maryland Constitution.[5] Two significant purposes lie at the core of the right of confrontation. One is to provide the defendant with an adequate opportunity for cross-examination.[6] *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965); *Crawford v. State,* 282 Md. 210, 214, 383 A.2d 1097 (1978). The other purpose is to give the judge and jury opportunities to observe the testifying wit-

---

**4.** The Sixth Amendment provides in part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him; ...." U.S. Const. amend. VI. The Sixth Amendment applies to the States through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965).

**5.** Article 21 provides in part "[t]hat in all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him; ... [and] to examine the witnesses for and against him on oath.... Md. Const.Decl. of Rts. art. 21.

The Sixth Amendment and Article 21 secure the same rights. *Wildermuth v. State,* 310 Md. 496, 505, 530 A.2d 275 (1987); *Moon v. State,* 300 Md. 354, 359, 478 A.2d 695 (1984), *cert. denied,* 469 U.S. 1207, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985).

**6.** Dean Wigmore has said that "[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*" 5 John H. Wigmore, *Evidence* § 1395, at 153 (James H. Chadbourn rev. 1974).

ness's demeanor. In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court, recognizing the importance of demeanor evidence, stated:

> The Court has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial, and that "a primary interest secured by [the provision] is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). In short, the Clause envisions
>
> > "a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."
>
> *Mattox v. United States*, [156 U.S. 237, 242–43, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895)].

448 U.S. at 63–64, 100 S.Ct. at 2537–38 (first alteration in original) (footnotes omitted). The Court of Appeals has also recognized the importance of ensuring that the fact-finder has an opportunity to evaluate a witness's credibility. *See Crawford*, 282 Md. at 214, 383 A.2d 1097 (primary purpose of requiring confrontation is to prevent depositions and other non-live testimony from being used against an accused in lieu of a personal examination and cross-examination of the witness).

Despite the importance of these considerations, a defendant's right of confrontation is not absolute:

> [T]here has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant. This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially

afforded provides substantial compliance with the purposes behind the confrontation requirement.

*Barber v. Page,* 390 U.S. 719, 722, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1968) (citations omitted). Prior to *Barber,* in cases in which the witness was outside the state, the mere absence of the witness from the court's jurisdiction was a sufficient predicate for a finding of unavailability. The traditional rule required no evidence of an attempt to bring the witness back to the state to testify. *See id.* at 723, 88 S.Ct. at 1321; 5 John H. Wigmore, *Evidence* § 1404 (James H. Chadbourn rev. 1974). In *Barber,* however, the Supreme Court held that "a witness is not 'unavailable' for purposes of the [traditional] exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber,* 390 U.S. at 724–25, 88 S.Ct. at 1321–22. Thus, a witness's mere absence from a state, without more, was no longer sufficient to establish the witness's unavailability.

Both state and federal courts recognized the effect of *Barber v. Page* on the analysis of whether an out-of-state witness is unavailable. For example, the Supreme Court of Hawaii, in *State v. Kim,* 55 Haw. 346, 519 P.2d 1241 (1974), stated, "the traditional rule—that the showing of the mere absence of the witness from the jurisdiction satisfied the constitutional requirement that the witness is 'unavailable'—was emphatically rejected in *Barber v. Page.*" 519 P.2d at 1244. And in *Eastham v. Johnson,* 338 F.Supp. 1278 (E.D.Mich.1972), the United States District Court for the Eastern District of Michigan observed:

> *Barber v. Page* discredited the old concept that a mere showing by the prosecution that a witness was in another state would constitute "unavailability" so as to justify the use of a transcript at a defendant's trial. Since *Barber v. Page,* the prosecution must do more than just show the witness is out of the jurisdiction of the state where the defendant is being tried.

338 F.Supp. at 1281.

Drawing on the principles enunciated in *Barber* and subsequent cases,[7] the Supreme Court in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), created a two-prong test for the admissibility of prior testimony. The prosecution must show that the witness is unavailable and that the testimony bears sufficient indicia of reliability. 448 U.S. at 65–66, 100 S.Ct. at 2538–39. *See also Moon v. State,* 300 Md. 354, 368–69, 478 A.2d 695 (1984) (discussing *Roberts* ), *cert. denied,* 469 U.S. 1207, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); *Cordovi v. State,* 63 Md.App. 455, 462, 492 A.2d 1328 (same), *cert. denied,* 304 Md. 297, 498 A.2d 1184 (1985). In *Roberts,* the Supreme Court further explained *Barber* 's good faith requirement with regard to the "unavailability" prong of the test for admissibility of prior testimony:

> The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation.

448 U.S. at 74, 100 S.Ct. at 2543 (emphasis in original).

In this case, appellant does not question the reliability of Dr. Torres's previous testimony; his challenge goes to the court's finding that Dr. Torres was unavailable as a witness. Specifically, he argues that the State's untimely attempt to use the provisions of the Uniform Act precluded a finding that Dr. Torres was unavailable to testify. He stresses that initiating the Act's machinery seven days before the start of trial is insufficient to allow the Act's procedures to run their normal course.

Our inquiry then is whether the use of the Uniform Act is a necessary element of any good-faith effort by the State in securing an out-of-state witness's presence at trial. Our

---

7. *E.g., Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

research has revealed that this Court, by way of dictum, has already answered this inquiry. Before discussing the relevant Maryland authorities, however, some preliminary comments about the Uniform Act are in order.

The Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings is in force in all fifty states, the District of Columbia, Puerto Rico, and the Virgin Islands.[8] Each jurisdiction's statute is modelled substantially after the act promulgated by the National Conference of Commissioners on Uniform State Laws. *See* 11 U.L.A. 1 (1936). Several courts have commented that the Act was intended as a matter of comity between states to facilitate the securing of material witnesses for criminal prosecutions, and that it does not provide for the delivery of a witness located in another state as a matter of course. *E.g., State v. Lesco,* 194 Kan. 555, 400 P.2d 695, 699 (1965), *cert. denied,* 382 U.S. 1015, 86 S.Ct. 628, 15 L.Ed.2d 529 (1966). It has been more recently observed, however, that the essence of the Act is "to create a community of jurisdictions which will honor the request of fellow members for the appearance of witnesses at criminal proceedings under the conditions specified in the Act." *People v. Superior Court,* 224 Cal.App.3d 1405, 274 Cal.Rptr. 586, 589 (1990).

The existence of the Uniform Act was an important factor in the Supreme Court's decision in *Barber v. Page* to require more diligent efforts by a state in securing the presence of an out-of-state witness. In rejecting the old rule that a witness's presence outside the court's jurisdiction excused the prosecution from producing him, the Court cited the Uniform Act as an example of the increased cooperation between the states themselves and between the states and the federal government that has deprived the old rule of "any continuing validity." *Barber v. Page,* 390 U.S.

---

**8.** Maryland's uniform act is codified at Md.Cts. & Jud.Proc.Code Ann. §§ 9–301 to –306 (1989). Puerto Rico's act is set forth at P.R.Laws Ann. tit. 34, §§ 1471–1475c (1991).

719, 723 & n. 4, 88 S.Ct. 1318, 1321 & n. 4, 20 L.Ed.2d 255 (1968).

## B

Only a few Maryland cases have discussed the Uniform Act in the context of determining the admissibility of the prior testimony of an allegedly unavailable witness.[9] One of the earliest cases to discuss the Act was *Contee v. State,* 229 Md. 486, 184 A.2d 823 (1962), *cert. denied,* 374 U.S. 841, 83 S.Ct. 1895, 10 L.Ed.2d 1062 (1963). In *Contee,* the Court of Appeals stated the prevailing, traditional rule regarding when a witness was unavailable: "[T]estimony taken at a former trial may be admitted, if it be shown that the witness is dead, insane, or beyond the jurisdiction of the court, or on diligent inquiry cannot be located. . . ." 229 Md. at 491, 184 A.2d 823. The defendant in that case was convicted of raping a woman who was an outpatient at a mental institution. The judgment was reversed. At the second trial, the State introduced the former testimony of the victim, who, the State asserted, was unavailable because she had been permanently committed to a mental institution in Michigan. *Id.* at 490, 184 A.2d 823. The director of the institution testified that the victim had been adjudicated insane and was incapable of understanding the obligation of oath. On this basis, the trial court admitted the victim's former testimony into evidence. *Id.* at 491–92, 184 A.2d 823.

---

9. In a case that did not involve the admissibility of prior testimony, *Midgett v. State,* 223 Md. 282, 164 A.2d 526 (1960), *cert. denied,* 365 U.S. 853, 81 S.Ct. 819, 5 L.Ed.2d 817 (1961), the defendant relied on the Act to argue that he was denied compulsory process for his witnesses. He contended that the State was obligated to use the Act to secure the attendance of his wife, who had moved to Florida before trial. 223 Md. at 300, 164 A.2d 526. The Court of Appeals rejected the defendant's argument because he did not proffer the substance of his wife's testimony in an effort to demonstrate that she was a material witness as required by the Act. The Court did not reach the question of whether, if the defendant had made a sufficient showing of materiality, the State would have been obligated to attempt to procure the wife's presence. *Id.* at 300–01, 164 A.2d 526.

The defendant challenged the finding of insanity and argued that the State could have used the Uniform Act to bring the victim to trial. Because the Court of Appeals affirmed the finding that the victim was mentally incompetent to testify, it did not decide the question of the State's failure to use the Act. It did comment, however, that the Act "does not extend the jurisdiction of any State, since it is based on comity[,]" and cited two cases from other states that held that the use of the Uniform Act was permissive and not a prerequisite to a proffer of former testimony. *Id.* at 492, 184 A.2d 823.

In 1967, this Court twice reached the issue that *Contee* did not. First, in *Britton v. State*, 2 Md.App. 285, 234 A.2d 274 (1967), *cert. denied*, 249 Md. 731 (1968), the defendant, convicted of robbery with a deadly weapon, asserted that the admission of the testimony of one of his victims from an earlier trial was erroneous because the State did not use the Uniform Act to bring the victim, who had moved out of state, back to Maryland. We held that the Uniform Act had "no effect" on the general rule regarding former testimony set forth in *Contee*, i.e., the Act was permissive and the State need only show that the desired witness was beyond the court's jurisdiction. 2 Md.App. at 289, 234 A.2d 274. Because the State did show that the witness was out-of-state and that it made a diligent inquiry to locate him, we affirmed the admission of the witness's former testimony. *Id.* at 290, 234 A.2d 274.[10]

---

**10.** Subsequently, in *Britton v. Maryland,* 298 F.Supp. 641 (D.Md.1969), the United States District Court for the District of Maryland granted the defendant's petition for habeas corpus relief. The court held that the State of Maryland had failed to use good-faith efforts to secure the presence at trial of the witness on whose testimony the State had primarily relied to convict the defendant. At the time of the second trial, the witness was enlisted in the Army and stationed in Oklahoma. The district court did not discuss the Uniform Act, but did hold that, under *Barber,* the State was obligated to make some effort to persuade the Army to cooperate in transporting the witness to Maryland for the trial. 298 F.Supp. at 647. In doing so, the district court emphasized the importance of the jury being able to observe the demeanor and

One week later, this Court reaffirmed *Britton* in *Reckard v. State,* 2 Md.App. 312, 234 A.2d 630 (1967), *cert. denied,* 248 Md. 734 (1968). There, the child witness, the alleged victim of an assault with intent to have carnal knowledge, lived in Virginia at the time of the defendant's second trial, and her parents refused to return with her to Maryland. We affirmed the introduction of the transcript of the child's testimony, citing *Britton* 's holding "that a State's Attorney is not required to utilize the provisions of that Act." 2 Md.App. at 315, 234 A.2d 274.

In *Graham v. State,* 7 Md.App. 638, 256 A.2d 709 (1969), *cert. denied,* 257 Md. 733 (1970), this Court, without opining on whether the prosecution was required to use the Act, affirmed the trial court's finding that the State made a good-faith effort to obtain the witness's attendance at the defendant's second trial where the State did, in fact, utilize the Act's provisions. When the prosecutor learned that the witness had moved to North Carolina, he prepared a petition under the Act and sent it to the appropriate North Carolina authorities, who were unable to locate the witness. We held that the prosecution made a good-faith effort to procure the witness's presence and, therefore, the witness was properly declared to be "unavailable." 7 Md.App. at 644, 256 A.2d 709.

We now turn to the case in which we find the answer to our present inquiry. The defendant in *Brooks v. State,* 35 Md.App. 461, 371 A.2d 674 *cert. denied,* 280 Md. 728 (1977), was convicted of an armed robbery that occurred at a restaurant in Maryland and of several handgun violations. He had previously been tried for the armed robbery of a Virginia restaurant. On appeal from his Maryland conviction, the defendant argued that the trial court erroneously excluded from evidence the transcript of the testimony given by the Virginia restaurant owner at the Virginia trial. The restaurant owner allegedly stated that the robbery

---

credibility of a witness whose testimony was the only incriminating evidence against the defendant. *Id.* at 646.

occurred on the same date and approximately at the same time as the Maryland robbery. The defendant argued that this testimony would have substantiated his alibi for the Maryland robbery that he was in Virginia at the time the Maryland crime was committed. 35 Md.App. at 466–67, 371 A.2d 674.

This Court affirmed the trial court's ruling, and in doing so, recognized the effect of *Barber v. Page* on the law involving the use of prior sworn testimony. First, we observed that the *Barber* rule requiring a good-faith effort in securing a witness's presence at trial applies not only to the State, but also to a defendant who attempts to introduce former testimony as a hearsay exception. *Id.* 35 Md.App. at 469, 371 A.2d 674. After noting that both Maryland and Virginia have adopted the Uniform Act, we stated:

> In [*Britton* and *Reckard*], this Court held that the State need not resort to the provisions of the Uniform Act in order to invoke the rule that testimony given at a former trial may be admitted if it is shown that the witness is beyond the boundaries of the State or, on diligent inquiry, cannot be located. *In view of the Supreme Court's subsequent decision in Barber, were the identical issue raised here now, we would reach the opposite result.* Analogously, we now hold that a defendant must show that he used the provisions of the Act but was nonetheless unable to secure the attendance of an out-of-state witness before such a witness' testimony, given at a former trial, may be admitted.

*Id.* at 470, 371 A.2d 674 (emphasis added). Because the defendant presented no evidence of a good-faith effort to secure the attendance of the Virginia restaurant owner at trial, we held that there was no proper showing of unavailability. *Id.*

■ The "identical issue" referred to in *Brooks* is now before us. Accordingly, we hold that before an out-of-state witness whose location is known is declared "unavailable" and his prior testimony is admitted, the State's (or, for that matter, the defense's) good-faith effort in procuring the

presence of that witness at trial must include a reasonable, timely attempt to utilize the provisions of the Uniform Act. In our view, the law's preference for live testimony and the spirit of cooperation between states that characterizes the Uniform Act make the requirement that the State use the Act as part of its good-faith effort a fair and reasonable one.

### C

Our holding is consistent with the trend of decisions of other states that have addressed similar situations. For example, in *People v. Freeland,* 101 Mich.App. 501, 300 N.W.2d 616 (1980), the Court of Appeals of Michigan addressed the issue of whether the prosecution exercised due diligence in attempting to produce a "res gestae" witness at trial. The defendant was charged with the theft of goods from a retail store. His actions were observed by two store security guards, one of whom the prosecution did not produce at trial. The prosecution presented evidence that it discovered the out-of-state location of that witness just two days before trial and that, when it contacted the witness by phone on the morning of trial, the witness refused to attend voluntarily the defendant's trial. 300 N.W.2d at 618–20. The court held that use of the Uniform Act was mandatory and that when the prosecution learned on the day of trial that the desired witness would not voluntarily appear, due diligence required that the prosecution move for adjournment of the trial and attempt to secure the witness's attendance using the Act. *Id.* at 621.

In *Smith v. State,* 546 P.2d 267 (Okla.Crim.App.1976), the defendant was convicted of the unlawful delivery of LSD. At his trial, the state sought to introduce the preliminary hearing testimony of a police informant who participated in the transaction for which the defendant was convicted. The state admitted that it knew the informant's out-of-state location. The state argued that its efforts to bring her to trial, consisting of serving her with an out-of-county subpoena, which, coupled with the fact that the informant honored a similar subpoena in appearing at the preliminary

hearing, constituted a good-faith effort to secure the witness's presence at trial. 546 P.2d at 271–72. The Court of Criminal Appeals of Oklahoma disagreed. The court stated that the ineffective subpoena and a lack of attempts to make personal contact with the witness to persuade her to testify at trial did not rise to the level of good-faith effort and due diligence required by *Barber v. Page.* The court held that when a witness's exact out-of-state location is known, the state's failure to use the Uniform Act precludes a finding that the state exercised good faith to secure the witness's presence at trial. *Id.* at 272.

Similarly, in *State v. Waits,* 92 N.M. 275, 587 P.2d 53 (Ct.App.1978), the state knew two months before trial that a critical witness who testified at a preliminary hearing was living in Texas. At that time, the state served a New Mexico subpoena on the witness. 587 P.2d at 54. The Court of Appeals of New Mexico observed that a New Mexico subpoena has no legal effect on a person living out of state, and held that, under the facts of the case, a witness is not unavailable unless the State has used the procedures of the Uniform Act. *Id.* at 55.

And, in *People v. Blackwood,* 138 Cal.App.3d 939, 188 Cal.Rptr. 359 (1983), the Court of Appeal of California held that reasonable diligence to secure a witness's attendance by the court's process requires the use of the Uniform Act when the prosecution knows the witness's location.[11] The witness had left California to travel through the Northwest states and Canada to Alaska. The prosecution's extensive search efforts finally located the witness in Alaska. When the prosecutor called the witness at his hotel and offered to pay travel expenses to California, the witness stated that he would not return for the trial because he did not want to leave his wife alone in Alaska. 188 Cal.Rptr. at 363–64.

---

11. California's evidence code provided that a witness was unavailable only if the proponent of his testimony had "exercised reasonable diligence but [had] been unable to procure his attendance by the court's process." *Blackwood,* 188 Cal.Rptr. at 363 (quoting Cal.Evid. Code § 240(a)(5)).

The court rejected the prosecution's argument that the Act was not required because it was unlikely that another state would have issued a subpoena due to the undue hardship to the witness. The court stated that "[t]he prosecution's duty was to invoke the Uniform Act, not to decide whether such action would be fruitful." *Id.* at 364.

Many other jurisdictions have held the Act to be mandatory in similar circumstances. *See, e.g., Anderson v. State,* 362 So.2d 1296 (Ala.Crim.App.1978) (mere showing that witness is in another state is insufficient because the Act was available); *State v. Ratzlaff,* 27 Ariz.App. 174, 552 P.2d 461 (1976) ("it seems reasonable to require the State to use the Uniform Act to *at least attempt* to enforce the attendance of an absent witness, even though he is in the military service"); *State v. Kim,* 55 Haw. 346, 519 P.2d 1241 (1974) (when witness is out of state, the State must show a good-faith effort to ascertain the actual location of the witness, and if necessary, use the Act to secure the witness's attendance); *Drummond v. State,* 86 Nev. 4, 462 P.2d 1012 (1970) (there could be no finding of good faith or due diligence where the State did not use the Act despite knowing before trial the witness's out-of-state address and that the witness was in fact there); *State v. Sweeney,* 45 Wash.App. 81, 723 P.2d 551 (1986) (the State must use the procedures of the Act when it becomes apparent that the witness is no longer cooperating).

The post-*Barber* decisions that have not required usage of the Act addressed situations factually different from the case before us. *See, e.g., People v. Arguello,* 737 P.2d 436 (Colo.Ct.App.1987) (reliance on Act would have been "useless" where parents of child victim absolutely refused to allow child to testify at defendant's third trial for sexual assault and where child had been thoroughly cross-examined at two previous trials); *State v. Young,* 20 Ohio App.3d 269, 485 N.E.2d 814 (1984) (Act not required where State did not know until after trial had begun that witness would not appear); *State v. Davis,* 293 N.W.2d 885 (S.D. 1980) (Act not required when witness's location is not known).

D

■ Whether the prosecution made a diligent, good-faith effort to secure the presence at trial of a witness turns on the particular facts of each case. In our view of the case *sub judice*, the State's failure to make timely use of the Uniform Act to attempt to compel Dr. Torres's presence precluded a finding that Dr. Torres was "unavailable" for trial. Initiating the Act's procedures just one week before trial simply did not allow enough time for the Act to run its normal course to an ultimate disposition, whether favorable or unfavorable to the State. We recognize that the State brought the issue of Dr. Torres's possible unavailability to the court's attention almost immediately after speaking with Dr. Torres for the first time on 27 December 1991. Then, based on the court's advice, the State prepared a Uniform Act subpoena and mailed it to Puerto Rico via an express mail service. Thus, once it learned definitively where Dr. Torres resided and that he would not return to Maryland voluntarily, the State acted promptly in contacting the trial judge and issuing a Uniform Act request. The fact remains, however, that by the time the Puerto Rican authorities were to receive the Uniform Act request, 2 January 1992, only four days remained before trial. The record reveals no attempt by the State to follow up its request and no attempt to seek a continuance of the trial in order to permit time for the Act to run its normal course. Because the required events under the Act could not reasonably be expected to occur within four days, the State's failure to seek to ensure that enough time was available requires us to conclude that the State's efforts fell below the good-faith standard.

The Uniform Act's procedures are not complex, but they are extensive. The court in which the witness has been subpoenaed to appear (the requesting court) must send a certificate to the court in the county in the state in which the witness resides (the requested court) stating that the witness is material and necessary to the requesting court's action. The requested court, after giving notice to the

witness, must conduct a hearing at which the court, before compelling the witness to appear and testify in the requesting court, must determine that the witness is material and necessary and that the witness will not suffer undue hardship in being compelled to attend the trial. It is only after the requested court makes these determinations that measures will be taken to ensure the witness's appearance in the requesting court.

In view of the extensive proceedings required by the Act, it is wholly unreasonable to expect the process to reach a conclusion within four days. The geographical separation of two jurisdictions as far apart as Maryland and Puerto Rico supports the unreasonableness of the situation in the case *sub judice*.[12] Nothing in the Act requires the requested court to put its daily operations on hold and immediately address the requesting court's subpoena, or otherwise to expedite the process. In short, for all its usefulness, the Uniform Act is not a magic potion that cures overnight; it requires time to operate, and it is the obligation of the party that is utilizing the Act to ensure that sufficient time exists, or to produce evidence that a conclusion was reached, favorable or not, on its request within the time elapsed. If information as to the witness's location comes to the party too late to institute the Uniform Act proceedings and obtain a judicial determination before the time set for trial, that party has the additional burden of moving for a continuance of trial and attempting to secure the attendance of the witness through the Act.

We recognize that our holding may require yet another trial, with undesirable costs to all of the witnesses, the State, and the overburdened criminal justice system. But, when balanced against a defendant's right of confrontation, the inconvenience of another trial cannot receive primary consideration. The confrontation clause serves purposes that are too important to dismiss when the State has used

---

12. Indeed, the State acknowledged this when the prosecutor observed to the trial judge that "it's not as easy as it sounds."

less than good-faith efforts to bring to the trial the witnesses with whom it seeks to establish a defendant's criminal guilt or criminal responsibility.

In this case, the State could have moved for a continuance to attempt to obtain Dr. Torres's presence by means of the Act, but it did not.[13] It knew no later than 1 July 1991, when our mandate issued in appellant's first appeal, that a new trial was to occur. This record does not indicate that the State endeavored to locate Dr. Torres until November 1991 when it learned he was no longer employed at the Perkins Hospital. For the reasons stated earlier, the State failed to show a good-faith effort to secure the attendance at trial of Dr. Torres, and we must conclude, on this record, that the trial court erred in declaring the witness to be unavailable. *See People v. Dye,* 431 Mich. 58, 427 N.W.2d 501, 510–11 (among other reasons, court held that prosecution's initiation of the Act's procedures seventeen days before trial and follow-up request just six days before trial precluded finding of due diligence where prosecution knew of retrial date three months ahead of time), *cert. denied,* 488 U.S. 985, 109 S.Ct. 541, 102 L.Ed.2d 571 (1988); *People v. Freeland,* 101 Mich.App. 501, 300 N.W.2d 616, 621 (1980) (after learning of location of missing witness two days before trial, prosecution was required to move for continuance to utilize the Act's provisions); *State v. Sweeney,* 45 Wash.App. 81, 723 P.2d 551, 554 (1986) (State should have moved for continuance to obtain witness's presence by means of the Act).

E

The error in admitting Dr. Torres's testimony at trial without first establishing that he was unavailable was

---

**13.** August 1993, the time frame when Dr. Torres said his Jesuit superior indicated he would be available, was not necessarily the earliest the trial could have been conducted with Dr. Torres in attendance. Until the procedures of the Act ran their course, no one could say that his compulsory attendance could not have been at an earlier date. Moreover, exploration of when the circuit court could have reset this case for trial remained uninvestigated on this record.

not harmless. In determining whether an error is harmless, we consider whether "the erroneous ruling, in relation to the totality of the evidence, played a significant role in influencing the rendition of the verdict, to the prejudice of the appellant." *Dorsey v. State,* 276 Md. 638, 653, 350 A.2d 665 (1976). Unless "upon [our] own independent review of the record, [we are] unable to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated." *Id.* at 659, 350 A.2d 665.

A jury, of course, is free to believe or disbelieve any evidence that it chooses. In the instant case, the jury obviously gave more weight to the testimony of Drs. Torres and Mokhtari than to that of appellant's experts. At a trial involving five experts (four of whom worked for the same hospital), the demeanor and credibility of those experts— and, thus, the jury's opportunity to assess their demeanor and credibility—is greatly significant. For that reason, we cannot overlook the fact that Dr. Torres was essentially one-half of the State's case against appellant, yet the jury was denied the opportunity to observe Dr. Torres render his opinions about appellant's mental disorders and his criminal responsibility. This lack of opportunity is particularly egregious in light of appellant's choice to exercise his right to a jury trial, a right he was unaware of at his first trial.

The error in receiving Dr. Torres's transcribed testimony, based on an insufficient showing of his unavailability, constituted a denial of defendant's right to have the jury observe the witness's demeanor and make a competent evaluation of his credibility. Therefore, we cannot say beyond a reasonable doubt that the error in no way influenced the finding of criminal responsibility.

## II

■ Appellant's other argument on appeal is that, contrary to the jury's finding, the evidence was sufficient to

establish by a preponderance of the evidence that he was not criminally responsible for the murder of Shirley Baker. We need not and do not address this issue. In criminal appeals, of course, a Maryland court of appeal is required to address sufficiency of the evidence issues even if the court has already decided to reverse the defendant's conviction on other grounds. The rationale for this requirement is anchored in double jeopardy principles. If an appellate court determines that *no* "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), i.e., that the evidence was insufficient to sustain a conviction, then double jeopardy prohibits the retrial of the defendant for the crime at issue. The court's determination that the defendant, based on other grounds, was entitled to reversal and a new trial is no longer relevant. In this case, however, it was the appellant's criminal responsibility—not his guilt or innocence—that was at issue. Thus, the danger of double jeopardy is not present.

We perceive that appellant's attempt to fashion a sufficiency argument is misplaced in this case for other reasons as well. He, not the State, had the burden of proof and of persuasion. Given the factual and expert opinion testimony before it, the jury was not persuaded by appellant's evidence. We cannot substitute our judgment for that of the fact-finder under such circumstances, nor can we say as a matter of law that the jury should have been convinced of the appellant's lack of criminal responsibility on this record. Accordingly, we do not decide whether the evidence was sufficient to establish that appellant was not criminally responsible, and leave that instead to another trial and, presumably, another jury.

JUDGMENT OF CRIMINAL RESPONSIBILITY IS REVERSED; COSTS TO BE PAID BY WASHINGTON COUNTY.