474 A.2d 967

**Ronald Larry BARROW**

**v.**

**STATE of Maryland.**

**No. 1203, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

May 11, 1984.

170

174

Mark A. Van Bavel, Baltimore, with whom were Sally C. Chester and Walker, Rubin & Van Bavel, P.A., Baltimore, on brief, for appellant.

Ann E. Singleton, Asst. Atty. Gen. with whom were Stephen H. Sachs, Atty. Gen. of Md., and John Scarborough, State's Atty. for Cecil County on brief, for appellee.

Argued before ADKINS, ALPERT and GETTY, JJ.

ALPERT, Judge.

The facts of this appeal read like a multi-issue hypothetical question from a criminal procedure law school examination. First, we must determine the legality of a search and seizure of a getaway vehicle. Then, we are asked to assess the constitutional propriety of pre-trial and in-court witness identifications of Ronald Larry Barrow, appellant.

For those who believe there are no modern day heroes, we introduce Carmen Lee Sturgill, a 39 year-old, lifelong resident of Cecil County, Maryland. Shortly before 7:00 a.m. on January 15, 1983, Sturgill was sitting in his car in the parking lot of the Hollywood Diner in Elkton, Maryland when he observed a man walking into the diner's vestibule.

This man was "acting like he was using the telephone, but he wasn't." Thereupon, Sturgill saw the man enter the diner. The man was white and wearing a green OD-type parka with fur trim on the collar. Sturgill noticed the man was standing with his arms extended. The man was pointing a gun. Sturgill realized he was witnessing an armed robbery.

Moments later the robber exited the diner and walked across the parking lot towards Melbourne Boulevard. To avoid detection, Sturgill stepped out of his car and crouched by the driver's door as the robber walked by. Fearlessly, Sturgill reentered his car in pursuit of the fleeing felon. Sturgill attempted to drive across the grass median on Route 40, "got stuck," put his car in reverse, "and got unstuck." At this point, the robber turned around, recognized Sturgill's intentions, and ran up Melbourne Boulevard away from the highway. At this point, Sturgill noticed a car parked on the crossover median on Melbourne Boulevard. Sturgill approached the car, felt its warm hood, detected heat from the grille area and concluded that the vehicle had been driven to the diner by the robber and that it might be a potential getaway car. To avoid any such use, Sturgill flattened the car's left front tire. Undaunted, Sturgill continued to pursue the robber on Melbourne Boulevard into a residential area known as Thompson Estates but eventually lost track of him.

Sturgill then returned to the diner where he met Trooper Robert Perrot of the Maryland State Police. Sturgill recounted his observations and his attempt to capture the robber. Sturgill showed the Trooper the now-unmoveable car. Trooper Perrot felt the hood; it was warm to the touch. The warmth was particularly noticeable because the previous night had been snowy and cold. The automobile was parked approximately one-tenth of a mile from the diner and could not be seen from the diner as it was blocked by several trees. Trooper Perrot believed that the car had been purposefully concealed. The car's doors were closed but unlocked. Trooper Perrot espied an orange envelope on

the front passenger seat. The trooper recognized it as the type of envelope used by the Motor Vehicle Administration to send license and registration renewals. He picked up the envelope, opened it, and discovered the car was registered to Alice Deibert Barrow, appellant's mother, of Elkton, Maryland. Also inside the envelope was a driver's license in the name of William Heine of Newark, Delaware. A picture of Mr. Heine was impressed upon this license. Keys to the vehicle were located under the gas pedal. Trooper Perrot seized the registration, driver's license and the keys. He contacted Delaware authorities to see if they could locate Mr. Heine at the address listed on the license. The trooper and Sturgill continued to search the area but failed to locate the robber.

Trooper Perrot returned Sturgill to the diner and then proceeded with another trooper to Alice Barrow's house. While at the diner, the trooper showed the Heine driver's license to Sturgill and to Esther Anderson and Adeline Larkin, waitresses on duty during the robbery. The three witnesses were asked whether the man pictured on the license was the robber. Larkin responded, "It looks like it. He has the tinted glasses and his hair was long like it was when I saw him earlier." As Sturgill had never seen the robber's face, he could not make an identification from the license. Anderson indicated that the photograph "[d]idn't look like him [the robber]."

At the Barrow house, now about 8:00 a.m., Ms. Barrow told police that her son, the appellant, had been operating her car the night before and that he arrived home, drunk, at approximately 2:30 a.m. Ms. Barrow got her son from his bedroom. Appellant told the troopers that his mother's car had broken down the night before and that he arrived home around 2:30 a.m. Trooper Perrot noticed that the photograph on the William Heine Delaware license looked "exactly the same as Mr. Barrow." When questioned about the license, appellant admitted that he had fraudulently obtained the Delaware license by using his photograph with a friend's birth certificate. The troopers informed appellant

that they were investigating the robbery at the Hollywood Diner, and appellant agreed to go back to the diner "to get this matter cleared up."

The troopers drove appellant to the diner. Only one eyewitness to the robbery, Esther Marie Anderson, was there at that time. Although Trooper Perrot recalled no conversation with Anderson, Anderson later testified that she was asked whether she recognized appellant and that she "didn't know for sure" but believed "he looked like the guy." Trooper Perrot and appellant left the diner and went to police barracks. Appellant's picture was taken and a photo spread was arranged for Larkin and Sturgill at 11:00 a.m. later that morning.

Sturgill and Larkin drove together to police barracks. On the way to the station, the two witnesses saw appellant sitting in a police cruiser. They continued to drive to the police barracks two car lengths behind the police car. When they arrived, Larkin parked her car in the visitor's section of the parking lot. She and Sturgill watched as appellant was removed from the police car. Larkin observed appellant's walk. She recognized it; the robber had walked in the same manner. Once inside the station, Larkin selected appellant's photograph from an array and stated that the man pictured had robbed the diner. Again, Sturgill was unable to identify the man he had observed in and chased from the diner.

Later that afternoon, Ms. Anderson arrived at the station to give a statement. She told police that she knew the man who had robbed the diner. She had met him one year before when she went to Alice Barrow's house to look for antique furniture. Although Trooper Perrot believed that Anderson had not been shown the photo array, Anderson stated that she chose appellant's photo from a group and identified the man as the robber.

Two days later, Jack Kyle, a truck driver, frequent visitor to the Hollywood Diner, and witness to the robbery, was

asked to review a photo array at police headquarters. He selected appellant as the robber.

Appellant was charged with armed robbery and related offenses. Prior to trial, appellant moved to suppress the driver's license, registration and set of keys from his mother's car. Appellant further sought to preclude the pre-trial photograph identifications made by Anderson and Larkin and the (potential) in-court identifications by Anderson, Larkin and Kyle. After a hearing and arguments, Judge H. Kenneth Mackey denied appellant's motions.

The case came on for trial before a jury on July 14, 1983 (Judge Donaldson C. Cole, Jr., presiding). Appellant was convicted of armed robbery and use of a handgun while committing a crime of violence. Aggrieved at this result, appellant has noted a timely appeal and asks us to consider whether the motions judge erred by failing to suppress the evidence seized from his mother's car as well as the various pre-trial and in-court identifications.

I. *Warrantless Search and Seizure of the Getaway Automobile*

Appellant hyperbolically states that "if the search and seizure of appellant's mother's automobile is upheld, every unlocked and parked car on a street in Elkton is unprotected by the Fourth Amendment." Appellant reasons that Trooper Perrot was without probable cause to suspect that a nexus existed between the car and its contents and the Hollywood Diner robbery. Appellant has understated the actions and observations of Carmen Lee Sturgill.

At the suppression hearing Trooper Perrot testified that he met Sturgill when he arrived at the diner to investigate the robbery. Sturgill recounted his attempts to capture the robber. He described how the robber had headed initially toward the car, but that the robber had altered his escape route upon noticing Sturgill. Sturgill provided the trooper with the robber's physical appearance, the robber's escape route, and Sturgill's discovery of what he believed to be a

possible getaway vehicle. Trooper Perrot accompanied Sturgill to the immobilized automobile. He confirmed Sturgill's belief that the car had recently been used by feeling the car's warm hood. The trooper then noticed the envelope on the front passenger seat. His experience told him that sort of envelope contained car registration renewals. Trooper Perrot picked up the envelope and inside discovered the appellant's mother's car registration and appellant's fake Delaware driver's license.

A motor vehicle may be searched without a warrant where police have "probable cause in the constitutional context to believe that the vehicle contains the fruits, instrumentalities, or other evidence of crime." *Mobley and King v. State*, 270 Md. 76, 80, 310 A.2d 803 (1973) (and cases cited therein), *cert. denied*, 416 U.S. 975, 94 S.Ct. 2003, 40 L.Ed.2d 564 (1974). This exception to the Fourth Amendment warrant requirement is justified because the exigent circumstances caused by the inherent moveability of a motor vehicle makes the obtaining of a warrant impracticable. *Id.* [270 Md.] at 80–81, 310 A.2d 803 (*citing Coolidge v. New Hampshire*, 403 U.S. 443, 459–460, 91 S.Ct. 2022, 2034–2035, 29 L.Ed.2d 564 (1971); *Carroll v. United States*, 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925)). Probable cause exists for a warrantless automobile search when facts and circumstances known to police are such "as would warrant a man of reasonable caution [to believe] that the vehicle contained articles lawfully subject to seizure." *Id.* [270 Md.] at 81, 310 A.2d 803. In order to satisfy the probable cause requirement, there is no necessity that an investigating officer have personal knowledge that the car contains fruits, instrumentalities or evidence of a crime; the probability of criminal activity is enough. *Id.*

We think the record in this case contains evidence supporting a finding of probable cause that the vehicle was related to the Hollywood Diner robbery and that it could contain or was in fact evidence of that crime. Our determination is based upon the vehicle's concealed location and

proximity to the diner, evidence of its recent use, and, most of all, Carmen Sturgill's observation of the fleeing robber's attempt to reach the car immediately after the crime.

We observe, however, that this warrantless search does not squarely fit into the traditional "automobile exception" due to Sturgill's apparent immobilization of the car. Here, there was no apparent reason to fear that the unoccupied car and its contents would disappear. Still, other (non-*Carroll*) exigent circumstances abounded. Trooper Perrot was hot on the trail of an armed robber, he had reason to believe that the armed robber had concealed his getaway car within 500 feet of the scene of the crime, and that the robber might still be in the neighborhood. If time was ever of the essence, it was here! While Sturgill's act of flattening the car's tire may have lessened the ability to remove the car, we are unconvinced it lessened the urgency of the situation. There still existed a great need to apprehend the armed robber who was associated with the car. It was not practicable to delay the investigation in order to obtain a search warrant.

■ These facts illustrate a newly-recognized type of exigency to be considered in conjunction with probable cause when applying the automobile exception to the warrant requirement—the getaway car exigency principle. This doctrine was first articulated in *United States v. Robinson*, 533 F.2d 578 (D.C.Cir.1975) (en banc), *cert. denied*, 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976). In *Robinson*, police located what they had probable cause to believe was the getaway car to a bank robbery. The car was parked on a city street, its doors were locked, its occupants had departed. Police coverged on the vehicle, looked through the window and saw a bundle of clothing with a blue coat on top in the passenger's seat. Fifteen minutes later, a victim of the robbery identified the type of car as the one used by the robbers. The car was unlocked and money and the revolver were found under the blue coat. The search was held to be legal.

Although this case is not governed by the *Carroll* "automobile exception" for cars stopped on a highway, it does present a situation in which time was of the essence and it was "not practicable to secure a warrant." *Carroll*, 267 U.S. at 153, 45 S.Ct. at 285. There was need to proceed as quickly as possible to apprehend the robbers who had used this as the getaway car in an armed bank robbery consummated about an hour prior to the search. There was strong probable cause to believe this was the getaway car. Bank robbers known to have been armed were at large, posing current dangers to the police and other citizens. An immediate search of the car could well produce the information needed to speedily apprehend the culprits. Delay to obtain a warrant could have impeded a promising police investigation and conceivably provided the added time needed by the bank robbers to avoid capture altogether. *Cf. United States v. Ellis*, 461 F.2d 962, 966 (2d Cir.), *cert. denied*, 409 U.S. 866, 93 S.Ct. 162, 34 L.Ed.2d 115 (1972). The case is within the spirit, though not the text, of the "hot pursuit" exception established in *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

We therefore hold that this getaway car case entails exigent circumstances that justify a warrantless search of the car for clues as to identify or location of suspects. The pertinent factors are much like those set out by this court in *Dorman v. United States*, 140 U.S.App.D.C. 313, 319–21, 435 F.2d 385, 391–93 (en banc, 1970), as showing "urgent need" justifying a warrantless nighttime entry into a private home to effect an arrest. As in *Dorman*, we have a grave offense; a clear showing of probable cause; reasonable belief that the suspects are armed; a likelihood that the suspects will escape if not speedily apprehended, and peaceable entry. This case lacks the element of "strong reason to believe that the suspect is in the premises being entered," which was stressed in *Dorman* as justifying a warrantless entry into the suspect's home to make an arrest. But in the case of a car on the

street there is both lesser expectation of privacy than in a home, and the entry into a car believed on strong probable cause to be the getaway car is justified, even though the suspect is plainly not now inside, in order to get clues that will aid location and apprehension of the suspect.

*Id.* at 583–84 (footnotes omitted). Other cases applying the getaway car exigency principle include *Shreeves v. United States*, 395 A.2d 774, 785–86 (D.C.App.1978); *Gaddis v. State*, 267 Ind. 100, 368 N.E.2d 244, 247–48 (1977); *Barnes v. State*, 406 So.2d 84, 85 (Fla.App.1981).

The most factually analogous case we have found is *Gray v. State*, 596 P.2d 1154 (Alaska 1979). In that case, police were informed that a supermarket robbery had been committed by three people, two males and one female, and that the robbers had fled the scene in a stationwagon. Soon thereafter, the police stopped a vehicle matching this description. A woman alighted from the vehicle and police ordered the other two occupants out of the car. While one complied, the other moved behind the driver's wheel of the car and sped away. The police left the two robbery suspects, and set chase after the stationwagon. During the course of this chase, the driver rolled out of the car, and the car crashed into a residence. The driver was captured and police returned to the stationwagon. The car was searched and a purse was observed. The purse was opened; it contained names and addresses which led police to the other participants in the robbery.

Upon applying the precepts of *Robinson*, the Supreme Court of Alaska held that the search was permissible. A grave offense had been committed; there was probable cause that the stationwagon was the getaway vehicle; its occupants were armed; the two suspects left behind would flee if not quickly apprehended; and a peaceable entry was made into the car, culminating with the search of the purse. *Id.* at 1157.

■ For these same reasons, the getaway car exigency principle is equally applicable in the case *sub judice.* The

Hollywood Diner armed robbery was a serious offense; there was probable cause to believe that the car spotted by Sturgill was intended to be used as a getaway car; Trooper Perrot knew that the robber was armed; obviously, there was the likelihood that the robber might not be found unless immediately apprehended; and the Trooper's entry was peaceable. Accordingly, we hold that there were exigent circumstances justifying the warrantless search of this getaway car and its contents.

## II. *Pre-Trial Identifications*

■ One of the strongest pieces of evidence the prosecution can offer is an eyewitness to a crime who identifies the defendant as the perpetrator of that crime. Also damaging is the introduction of an identification made prior to trial. There are three types of pre-trial identifications—line-ups, show-ups (or confrontations), and photographic identifications. As these identifications occur outside the courtroom in less controlled atmospheres, they must be especially scrutinized to protect the defendant's right to counsel and to due process safeguards. *See generally* the discussion in *United States v. Wade*, 388 U.S. 218, 228–33, 87 S.Ct. 1926, 1933–1935, 18 L.Ed.2d 1149 (1967). A defendant has the right to counsel at post-charge lineups, since such a procedure constitutes a critical stage of the prosecution and the accused may be unaware of any suggestive influences. *Id.* at 227, 87 S.Ct. at 1932. Counsel is not required at a pre-charge line-up, *Kirby v. Illinois*, 406 U.S. 682, 689–90, 92 S.Ct. 1877, 1882–1883, 32 L.Ed.2d 411 (1972) or a pre- or post-charge photographic display, *United States v. Ash*, 413 U.S. 300, 317–21, 93 S.Ct. 2568, 2577–2579, 37 L.Ed.2d 619 (1973).

■ An accused is entitled to due process of law to ensure that a pre-trial identification is not "so unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). In order to determine whether an accused was denied due process, the totality of the

circumstances surrounding the identification must be examined. *Id.* Factors assisting with the *Stovall* analysis include the suggestiveness of the identification procedure, the necessity of using that procedure, and the likelihood of misidentification. C. Whitebread, *Criminal Procedure,* § 18.02 at 356 (Foundation Press 1980). An identification procedure may be suggestive if it instructs the witness that "this is the man." *See, United States v. Wade,* 388 U.S. at 232–37, 87 S.Ct. at 1935–1937. A suggestive procedure may be sanctioned, however, on the grounds that it was necessary because of exigent circumstances and where the resulting identification was reliable. *Simmons v. United States,* 390 U.S. 377, 384–86, 88 S.Ct. 967, 971–972, 19 L.Ed.2d 1247 (1968). The element of reliability seems to be the most important factor in the *Stovall* analysis. The Supreme Court has made clear that "reliability is the linchpin in determining the admissibility of identification testimony...." *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Indicia of reliability may be gleaned from the witnesses' opportunity to view the criminal during the commission of the crime, the witnesses' degree of attention, the accuracy of the witnesses' prior description of the criminal, the level of the witnesses' certainty at the confrontation, and the length of time between the crime and the confrontation. *Id.* (*citing Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972)).

A defendant alleging an illegal pre-trial identification carries the initial burden to make a prima facie showing that a pre-trial confrontation or viewing was illegal. *Smith and Samuels v. State,* 6 Md.App. 59, 68, 250 A.2d 285, *cert. denied,* 255 Md. 743, 254 Md. 720 (1969), *cert. denied,* 397 U.S. 1057, 90 S.Ct. 1402, 25 L.Ed.2d 674 (1970). If the defendant meets this initial burden, the burden then shifts to the State to show by "clear and convincing evidence" that the pre-trial confrontation or viewing was legal. *Smith and Samuels v. State,* 6 Md. App. at 68, 250 A.2d 285. If the State satisfies that burden,

there is no further constitutional objection to the admissibility of any identification made at the pre-trial confrontation or viewing or any courtroom identification derived therefrom. On the other hand, if the State fails to satisfy its burden, any identification made at the pre-trial confrontation or viewing is subject to exclusion.

Even if the State fails to satisfy the legality of a pre-trial confrontation or viewing, the State may still secure the admissibility of a *courtroom identification* by the same identifying witness if it establishes by clear and convincing evidence that a courtroom identification had a source independent of the prior illegal confrontation or viewing. Relevant factors in determining whether the courtroom identification has an independent source include whether the witness knew the defendant prior to the crime, the witness' opportunity to view the defendant at the time of the crime, the description or identification of the criminal made by the witness prior to the illegal confrontation or viewing, and the facts surrounding the identification at the illegal confrontation or viewing. *United States v. Wade*, 388 U.S. at 240–42, 87 S.Ct. at 1939–1940 (*applying Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)); *Smith and Samuels v. State*, 6 Md. App. at 68–69, 250 A.2d 285.

Once identification evidence is deemed admissible as a matter of law, its reliability becomes an issue of fact to be resolved by the jury. Any uncertainty expressed by a witness regarding his or her identification affects the weight placed on that evidence and not the issue of admissibility. C. Whitebread, *Criminal Procedure*, § 18.04 at 362.

To summarize, a courtroom identification of a defendant is generally admissible unless it is tainted by an unconstitutional pre-trial identification or is so unreliable as to violate due process. Likewise, a pretrial identification of a defendant is normally admissible regardless of whether the identifying witness is able to make a courtroom identifi-

cation,[1] unless it was unconstitutionally obtained or is so unreliable as to violate due process.

Against this legal backdrop, we shall review each of the identification issues raised by appellant.

### A. *Esther Marie Anderson*

At the suppression hearing, Anderson testified that the robber was tall and slender, had a moustache, was wearing dark glasses, and was clad in a big overcoat with a fur hood. She explained that when Trooper Perrot brought appellant back to the diner she was not positive, but believed that appellant looked like the robber. Anderson further stated that sometime after the robbery, but before Trooper Perrot brought appellant to the diner, she recalled she had met the man who had robbed the diner. Anderson had met appellant at his mother's house during the summer of 1982.

That afternoon, Anderson arrived at police headquarters to review the photograph spread. She told Trooper Perrot about her prior meeting with appellant and told the trooper she had not made a positive identification during the show-up because she was still frightened from the robbery.

Appellant asserts that Esther Anderson's failure to identify him after viewing the photographic license and after seeing appellant in a one-on-one showup at the diner rendered her third opportunity, the photographic identification at the police station, impermissibly tainted and unreliable. Appellant contends that Ms. Anderson's confrontations with his license and his person were so suggestive that her subsequent photographic identification and in-court identification were irreparably influenced and had a high potential for mistake. Applying the *Stovall* analysis we have articulated, we do not find that the procedures used to obtain Anderson's pre-trial identification were unduly suggestive.

---

**1.** The identifying witness, of course, must be available at trial for cross-examination. *Johnson v. State,* 237 Md. 283, 289–91, 206 A.2d 138 (1965).

Trooper Perrot, while in hot pursuit of a gun-wielding robber, merely displayed the photograph on the driver's license for the purpose of determining who to look for. A dangerous and unidentified criminal was on the loose. If the person in the license photograph was the armed robber, then the police could focus their investigation upon him and hopefully avoid the obvious danger which might result if the armed assailant was not promptly apprehended. On the other hand, if the eyewitnesses ruled out the face on the license photograph, then that person would benefit from instant exoneration. The showing of a photograph was tantamount to a "showup." Although some suggestiveness is inherent in the immediate display of a photograph such as in this case or in the case of a one-on-one showup, "it is not one of undue suggestiveness in view of the countervailing considerations that prompt on-the-scene identifications are likely to promote fairness, by enhancing the reliability of the identifications, and permit expeditious release of innocent suspects." *Foster & Forster v. State,* 272 Md. 273, 302, 323 A.2d 419, *cert. denied,* 419 U.S. 1036, 95 S.Ct. 520, 42 L.Ed.2d 311 (1974) (*quoting United States v. Wilson,* 435 F.2d 403, 405 (D.C.Cir.1970)). A further manifestation of a lack of suggestiveness would be Anderson's initial opinion that the robber did not look like the person on the license. This aspect of Anderson's testimony could bear on her credibility and affect the weight placed on the evidence but not on its admissibility.

Assuming arguendo that the showing of the license photograph and the subsequent showup were suggestive, they were not *unnecessarily* suggestive. What could have been more exigent than the fresh pursuit of the gun-toting robber?

We also conclude that no likelihood of misidentification existed. Ms. Anderson had ample opportunity to view the criminal at the time of the crime for she was the primary victim of the holdup. Her detailed description of events, the details of dress and appearance of the robber indicated a high degree of attention. Her description of the criminal

was accurate and totally consistent with the descriptions provided by the other two eyewitnesses. The impact of Anderson's inability to immediately identify appellant at the showup is tempered because, upon settling down, she remembered her prior meeting of appellant. The length of time between the crime and confrontation was merely a matter of hours.

Furthermore, because Anderson's in-court identification was not the *product* of any pre-trial identification procedure, "the suggestiveness *vel non* of [those] earlier confrontation[s] is immaterial"; *Godwin v. State,* 38 Md.App. 716, 726, 382 A.2d 596, *vacated on other grounds,* 284 Md. 85, 403 A.2d 785 (1978).

In this case the independent source of Esther Anderson's judicial identification is pellucid. She remembered the appellant, not because of the driver's license, not because of the showup, but because of her recollection of seeing him at his mother's house a year ago as refreshed by the startling events of the armed robbery on January 15, 1983. Where a robbery victim is previously acquainted with the robber, even a suggestive confrontation would not result in a likelihood of misidentification. It is that type of identification, based on prior familiarity, which has a high degree of reliability and is unlikely to be influenced by a suggestive identification procedure. *Bonner v. State,* 43 Md.App. 518, 522, 406 A.2d 646 (1979).

Esther Anderson's in-court identification of appellant was properly admitted.

### B. *Adeline Larkin*

Ms. Larkin testified at the suppression hearing that the robber was thin, approximately 6′1″ tall and had dark hair. She stated that she had a very good look at his face and eyes but did not notice a moustache. She provided police with a description and statement immediately following the robbery. She thought the man pictured on the license resembled the robber. When informed later that day that

the police wanted to see her, she proceeded to the police barracks in her own car with Sturgill and inadvertently happened to see the appellant exiting a police car walking into the barracks. Soon thereafter, Ms. Larkin selected appellant's picture from a photo array and identified him as the man who robbed the diner. It was appellant's walk which strengthened Ms. Larkin's identification of the appellant.

Appellant argues that Adeline Larkin identified the photograph of the appellant knowing he was a suspect, after seeing his photographic license and seeing him in the police car, and watching him walk into the station with the police officer. He further asserts that although Ms. Larkin sincerely stated that she based her identification on her observations during the robbery, the circumstances leading to her identification present a classic case of irreparable suggestiveness and unreliability. Appellant maintains that "though inadvertent on Ms. Larkin's part, she was totally inundated with observations of the appellant as a suspect."

 We have previously explained our reasons for finding that the display of appellant's false driver's license was not suggestive and was necessary under the circumstances. Assuming that Larkin's opportunity to observe appellant's walk while accompanied by police officers was suggestive,[2] we are not persuaded that this episode rendered her in-court identification unreliable. Like Anderson, Larkin demonstrated that her in-court identification was based on an independent source. She explained that she recognized appellant "from in the restaurant at the time of the robbery" and that she "will never forget that face pointing the gun at [her]." Consequently, any inadvertent suggestiveness caused by Larkin's opportunity to view ap-

---

**2.** The mere fact that suspects are in the presence of police during a show-up is not decisive on the issue of suggestiveness. *See, Foster & Forster v. State,* 272 Md. at 297, 323 A.2d 419. In this instance, appellant was unintentionally seen with police prior to a photo array.

pellant's walk is not critical. Hence, Adeline Larkin's in-court identification of appellant was properly admitted.

C. *Jack Kyle*

Jack Kyle was eating breakfast at the Hollywood Diner when the robbery occurred. He was able to see the robber's face for part of the time and described the person as a tall man in his early twenties with slender features and a slight growth which was not a full moustache. Kyle could not recall whether the robber was wearing glasses but he did notice that he was wearing a field jacket with a hood. At the suppression hearing Kyle explained that after he had identified the photograph of the appellant at the police station, he was told that other people had also picked out the same person.

Although appellant has no quarrel with Mr. Kyle's pre-trial photographic identification of the appellant, he vigorously asserts that "the confirmation by a State Trooper that Jack Kyle had selected the same photograph as other witnesses rendered his in-court identification inadmissible." Appellant urges the application of *Rustin v. State,* 46 Md.App. 28, 415 A.2d 631 (1980). In that case, the only witness to the crime, a police detective, was asked to make a pre-trial identification of a suspect. Prior to this confrontation, the witness was told that the suspect was the man whom the witness had seen. We ruled that this manifestation of suggestiveness had not been outweighed by the *Neil v. Biggers* reliability factors.

The case sub judice is factually inapposite to *Rustin.* Here, the possibility of suggestiveness occurred *after* Kyle had identified appellant as the robber. While it would have been a better practice for the police not to have confirmed Kyle's identification, we do not find that such action tainted his identification. *See, Brown v. State,* 4 Md.App. 612, 615–16, 244 A.2d 444 (1968), *cert. denied,* 252 Md. 729 (1969). Moreover, Kyle's identification was shown to be reliable. Kyle had the opportunity to view the robber because "he had nothing else to do except look at him."

Kyle's description of appellant matched those provided by the other witnesses. He was "positive" of his identification. Kyle's identification came only two days after the robbery. We hold that Kyle's selection of appellant's photograph was untainted and that his in-court identification was properly permitted.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.