622 A.2d 187

**Eric Joseph TIRADO**

v.

**STATE of Maryland.**

**No. 759, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

April 2, 1993.

538

James Wyda, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), both of Baltimore, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both of Baltimore, and William R. Hymes, State's Atty. for Howard County of Ellicott City, on the brief), for appellee.

Submitted before MOYLAN, BISHOP and ROSALYN B. BELL, JJ.

BISHOP, Judge.

Eric Joseph Tirado (Tirado) was charged with first degree murder, robbery with a dangerous and deadly weapon, two handgun violations, and being an accessory after the fact to murder. The State filed a notice of intent to seek the death penalty. After a jury trial in the Circuit Court for Howard County, Tirado was convicted of all charges except accessory after the fact. He was sentenced by a jury to life without parole for murder, twenty years for robbery, and two five year terms for the handgun violations; each sentence was consecutive to the others. Because a notice of appeal was not timely filed, our jurisdiction to decide this matter arises pursuant to the court's granting Tirado post-conviction relief in the form of a belated appeal.

## Issues

Tirado presents the following nine issues for our review: whether the court erred when it

I.     failed to grant defense counsel's requested relief for the State's discovery violation;

II.    limited Tirado's impeachment of witness Devarie;

III.   admitted evidence of other crimes;

IV.    admitted Trooper Coppinger's opinion testimony;

V.     admitted identification testimony;

VI.    admitted the expert opinion of Special Agent Spaulding regarding the sequence of shots;

VII.   instructed the jury on felony murder;

VIII.  instructed the jury on armed robbery; and

IX.    whether the court's cumulative errors require reversal?

## Facts

The record in this case is extensive. Tirado's trial commenced on June 17, 1991, and concluded about a month later on July 18, 1991. (Beginning April 17, 1991, and ending on June 12, 1991, a total of seven days of pre-trial motions hearings were held; jury selection began on June 13, 1991.) Numerous witnesses testified at Tirado's trial.

On March 29, 1990, John Anderson was driving a tractor-trailer northbound on I–95 at a speed of about seventy-two miles per hour. He and the driver of a car were "running parallel at approximately the same speed." Anderson saw a State trooper pull his police vehicle in between the tractor-trailer and the car; he then saw the trooper drop back behind the car and activate his car's emergency lights. The trooper and the driver of the car continued at the same speed for "approximately five-eights of a mile." He noticed that there were two occupants in the car. When the trooper turned on his spotlight, the light "reflected off the rear view mirror and [lit] the driver's face up." Subsequently, in November 1990, while watching television, Anderson saw the driver of the car being escorted in handcuffs by the police. Anderson recognized Tirado as being the driver of the car.

Also on March 29th, Wilbur Farver was driving his truck northbound on I–95 sometime between 3:54 and 3:56 a.m. He noticed, alongside the highway, a State trooper's vehicle with its lights on and a car stopped in front of it. Farver saw "a male get out of the front right side of the trooper's car." He noticed that the male "just slowly walked up to

the car that was apparently stopped in front of the trooper." The door of the police vehicle was left open. He then saw the man open the passenger door of the car, lean inside, and talk to the person seated inside. The occupant was leaning from the driver's side to the passenger's side. He then observed the man slowly walk back to the police vehicle.

Later that morning, at around 4:00 or 5:00 a.m., Officer Robert Loproto of the District of Columbia Metropolitan Police Department was travelling northbound on I–95 when he observed Corporal Wolf seated in a State Police vehicle with his head "slightly down." The vehicle's interior lights, emergency lights, and headlights were on. Officer Loproto stopped, walked toward the passenger side of the vehicle, and saw "blood on the front seat and ... blood all over [Trooper Wolf's] face."

At about 5:15 a.m., Officer Louis Martin of the Baltimore County Police Department responded to a call for a suspected stolen vehicle discovered behind a local restaurant. He saw what he believed to be blood inside the car and on the car's exterior. He found the "charred remains of what [he] believed to be a trooper's warning book, on the ground, approximately ten feet in front of the car toward the back door of [the restaurant]."

James Simms, a fingerprint expert with the Maryland State Police Department, testified that Tirado's fingerprints matched three fingerprints recovered from the driver's side of the stolen car. According to Simms, Tirado's right ring fingerprint was "positively identical in friction ridge characteristics to the blood print taken from the armrest" of the car. Tirado's fingerprints were also matched to three prints recovered from the clothing store bag found in the car's back seat. The fingerprints of Tirado's accomplice, Francisco Rodriguez, were found on papers that belonged to the car's owner.

Sharon Dubey, a forensic serologist with the Maryland State Police, testified that, based on tests conducted on the blood stains found in the stolen car and in the police vehicle,

Corporal Wolf was the sole source of the blood, and Tirado and Rodriguez were excluded as possible sources.

James Kaplan, a former Maryland assistant medical examiner, and an expert in forensic pathology, performed the autopsy of Corporal Wolf. In his opinion, Corporal Wolf sustained gunshot wounds to the lips, right cheek, and back of the head. According to Kaplan, Corporal Wolf was first shot in the lips—which caused his head to droop—and was subsequently shot in the cheek.

F.B.I. Special Agent Robert Spaulding, an expert in blood stain pattern analysis, testified that the blood stain patterns in the police vehicle's front and back seat areas were "consistent with the wounds that he suffered," but he "would not necessarily feel comfortable associating them with either particular shot."

Professor Herbert Leon McDonald, also an expert in blood stain analysis, testified that "both shots were fired from outside of the door [of the trooper's car]." He posited that the "back seat is uniformly spattered, and if a person were in the back seat, they would have intercepted the blood." He opined that no one could have been in the back seat when the shot was fired that caused the blood spatter in the vehicle because there were "no streaks or smears anywhere on the front or the back seat."

Edgar Devarie (Devarie), a friend of Tirado's, testified that, during the first week of April 1990, he went to Tirado's family's house in New York City to visit Tirado and Rodriguez. Tirado told Devarie that he shot a police officer. Tirado explained to Devarie that he and Rodriguez were travelling from Virginia through Maryland in a stolen car. Tirado said that he was the driver of the car, and that he was speeding. Tirado told Devarie that he stole the car because he did not have enough money to get back to New York.

According to Devarie, Tirado told him that a State trooper pulled over the stolen car, and after talking with Tirado, walked back to his vehicle with Tirado's license and regis-

tration.  At that point, Tirado and Rodriguez discussed who would kill the officer.  Tirado said, "I'll do it."  Rodriguez handed Tirado a .357 magnum and Tirado "put it in his pants."  The trooper then told Tirado and Rodriguez to come to his vehicle, and Tirado got in the front passenger seat of the police vehicle and Rodriguez got in the back.  The trooper then told Rodriguez to close the door, and Rodriguez got out of the vehicle to go close the door of the stolen car.  The trooper said, "Hey what are you doing?  Where are you going?"  Rodriguez said he was going to close the door of the car, and the trooper said, "No, not that door, this door."  Then Rodriguez got in the back seat of the car, and the trooper started to write a ticket.  Tirado then pulled out the gun and shot Corporal Wolf.  Tirado told Devarie that the trooper "straightened up, opened his eyes."  Because "he didn't know where the first bullet went," Tirado shot the trooper a second time in the head.

Tirado went on to tell Devarie that, after he shot the trooper, he took the ticket book, his driver's license, and other papers.  He then "cleaned up a bit and he ran."  The two men got back in the stolen car and drove to the next exit and abandoned the vehicle.  As they ran away, they burned Corporal Wolf's ticket book because it had Tirado's name on it.

Finally, Rosalinda Santos's prior recorded statements were admitted into evidence.  Before Tirado and Rodriguez left for New York, Santos heard Rodriguez exclaim that "[h]e was so mad that if somebody got in his way or stopped—or stopped him he would kill the person."  She overheard Rodriguez say, "I have nothing to lose, I'm going to jail."  Santos added that he said he "hates police."

Additional facts are provided in the discussion, *infra,* where necessary.

## I.

Tirado first contends that the trial court erred when it refused to declare a mistrial, or in the alternative, strike

Devarie's testimony, or grant a continuance. Specifically, he argues that the State violated discovery rules when it failed to disclose: 1) Devarie's correct address; 2) the fact that he relocated from New York to Maryland; and, 3) promises and inducements made by the State to Devarie to secure his testimony at trial. Tirado maintains that the State was required to disclose Devarie's most recent address—1035 Woodycrest Avenue. Even though the State notified defense counsel of Devarie's 40 Mont Clair Road address, Tirado urges that the State knew Devarie "never lived at the address provided during the entire investigation."

In his reply brief, Tirado clarifies that, although he does not contest the court's refusal to disclose Devarie's Maryland address, the State was nonetheless obligated to notify him that Devarie relocated. He suggests that the State's non-compliance with respect to its relocating Devarie without informing defense counsel, as well as promises and inducements made by the State to secure Devarie's testimony, left defense counsel surprised by the significance of Devarie's testimony.

Tirado further contends that the State's alleged discovery violations prejudiced him at trial. He complains that since he did not have the correct address, and consequently, could not locate Devarie before trial, he was unable to interview Devarie or prepare for his cross-examination. He insists that this was prejudicial because Devarie was the only witness to testify that Tirado was the gunman. We disagree.

### Non–Compliance with Discovery

Rule 4–263(b) provides in pertinent part:

DISCLOSURE UPON REQUEST.—Upon request of the defendant, the State's Attorney shall:

(1) Witnesses.—Disclose to the defendant the *name and address of each person then known whom the State intends to call as a witness* at the hearing or trial to prove its case in chief or to rebut alibi testimony....

(Emphasis added.) Generally, "[w]hen requested, the State's Attorney must give the defendant the names and addresses of each person he intends to call as a witness to prove his case in chief." *Coleman v. State,* 321 Md. 586, 601, 583 A.2d 1044 (1991). " 'The decision to compel disclosure ... is within the sound discretion of the trial court.' " *Id.* at 603, 583 A.2d 1044 (*quoting Brooks v. State,* 320 Md. 516, 525, 578 A.2d 783 (1990)). The Court of Appeals held in *Warrick v. State,* 302 Md. 162, 173, 486 A.2d 189 (1985), "that the question of whether any sanction is to be imposed for a discovery violation, and if so what sanction, is in the first instance committed to the discretion of the trial judge, and that the exercise of that discretion includes evaluating whether the violation prejudiced the defendant." *Evans v. State,* 304 Md. 487, 500, 499 A.2d 1261 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986).

In the case *sub judice,* after hearing testimony and arguments regarding defense counsel's allegation that the State failed to comply with discovery, the court concluded:

I don't find from the evidence that the State intended to conceal the whereabouts of this witness. In fact, the witness' [sic] own testimony was that he used the address of Montclare [sic] Road, that his dealings with the police were generally by using a phone number when he dealt with the police. I don't find that the State has intentionally tried to deprive or preclude access with this particular witness. To the extent the request is that ... I strike his testimony and/or grant a mistrial, I'll deny those requests.

He later denied defense counsel's request that the court recess at 3:00 p.m. on July 10, 1991, until 9:30 a.m. on July 11, 1991, to allow him time to talk with co-counsel who went to New York the night before to locate witnesses to impeach Devarie's testimony.

The question of whether the State violated its discovery obligations in this case is particularly troublesome. Even an unintentional violation of Rule 4–263 may require a mistrial if there is irreparable prejudice to the defendant.

*See Evans,* 304 Md. at 501, 499 A.2d 1261. We do, however, determine that the court did not abuse its discretion when it refused to grant a mistrial, or in the alternative, strike Devarie's testimony or grant a continuance. *See* Rule 4–263; *Evans,* 304 Md. at 501, 499 A.2d 1261.

On December 21, 1990, defense counsel filed a specific request for the names and addresses of individuals the State intended to call as witnesses. On February 22, 1991, the State informed defense counsel that Devarie would be called as a witness, and provided an address: "40 Mont Clair Road, Yonkers, NY." Although the State is under a continuing duty to disclose material information to the defendant once it has responded to requests for discovery, at no time did the State supplement that address with any other address or information with respect to Devarie's whereabouts. *See* Rule 4–263(h). Devarie's name was among at least 280 other names of individuals the State intended to call as witnesses against Tirado—undoubtedly, the defense's investigative resources were put to the test.

At oral argument, defense counsel conceded that, although the address the State disclosed was not "inaccurate," it was nonetheless "inadequate." Indeed, there was evidence that Devarie maintained contact with the 40 Mont Clair address. Devarie testified that he lived at "1035 Woodycrest" (in New York City) "on and off" for three years, and that he had not lived at 40 Mont Clair for a "year and a half." When pressed by defense counsel, he clarified that, before June 1991, he lived at 1035 Woodycrest. Devarie considered 1035 Woodycrest his current residence, but would stay at 40 Mont Clair from "time to time." He testified that since "family" resided at 40 Mont Clair, he would "always go there," and that his family would relay messages to him from that address.

Devarie used a post office box as his mailing address. Therefore, even though the State failed to disclose the 1035 Woodycrest address, assuming it had the address, Devarie's most accurate mailing address was a post office box, not 1035 Woodycrest.

Regardless, we hold that the address the State gave defense counsel was sufficient. Since Devarie did not sever ties with the 40 Mont Clair residence, he still could have been contacted at that address.

Moreover, there is nothing in the record to indicate that the State actually knew of any address other than 40 Mont Clair. Devarie testified that he did not give the State his 1035 Woodycrest address. We disagree, therefore, with Tirado's assertion that the State knew during discovery that Devarie "never lived at the address provided during the entire investigation." We recognize that, because the State spoke with Devarie by telephone during its investigation, it could have traced the calls to ensure that Devarie gave it his correct address. Devarie also testified that the police did visit him at that address. We conclude, however, that the State's disclosure was adequate—it was the only address Devarie gave the State, and he maintained contact with the residents at that location. Further, State troopers moved Devarie from the Woodycrest home in New York to Maryland in June 1991 contemporaneously with the commencement of trial.

Contact with Devarie was generally made at locations other than his current residence. In the beginning of the summer of 1990, a year before Tirado's trial, Devarie met with Sergeant Coppinger at a cousin's home. The next meeting between Devarie and Sergeant Coppinger occurred on a street in New York. A couple days later, Devarie spoke with Sergeant Coppinger over the telephone. At the end of the summer, Devarie was transported to Maryland to meet with the police and assistant state's attorneys. He subsequently met with the assistant state's attorneys "about ten times" in Maryland before trial, and again met with them after they relocated him to Maryland. Devarie and Sergeant Coppinger both testified that the State made *arrangements* for the relocation three months before trial, but his *actual relocation* did not occur until June 1991—at the start of the trial. The summons the State mailed to secure his attendance at trial was mailed to the 40 Mont

Clair address, and as discussed, *supra,* the State disclosed that address long before he relocated. To the extent his testimony was the result of an inducement, which the State conceded during oral argument, this does not support Tirado's contention that Devarie was otherwise unavailable to the defense—the State did not attempt to hide this witness.

Our conclusion that the State complied with discovery is further supported by defense counsel's lack of diligence vis-a-vis its efforts to locate Devarie. Defense counsel proffered that the last time they attempted to locate Devarie was on June 14 and 21, 1991—after the jury was selected and then later when trial commenced. Defense counsel never did disclose, in the record, when they *first* tried to locate Devarie. The only dates that appear in the record on which the defense attempted to locate Devarie were the 14th and 21st of June 1991. They left messages at his 40 Mont Clair address, but Devarie testified that he never got them. The State should have disclosed Devarie's new address. Yet, the State proffered that "at least on one occasion [defense counsel] wanted a more current address" of another witness, but that they did not request the same for Devarie. Defense counsel did not issue Devarie a summons, as they did other witnesses, to secure his attendance at trial. Defense counsel may have been surprised by Devarie's testimony, but we are not persuaded that they made a diligent effort to locate him before the trial. This point is further buttressed by the fact that Tirado and Devarie were friends. To the extent the State could have better assisted the defense in locating Devarie, the defendant was "in as good a position as the State, or for that matter a better one" to reveal the existence of a more recent address. *See Middleton v. State,* 49 Md.App. 286, 290, 431 A.2d 734, *cert. denied,* 291 Md. 779 (1981).

## II.

■ Tirado next complains that the court improperly restricted his impeachment of Devarie. He argues that the court erred when it 1) refused the out-of-court statement of

a third party (Napoleone)—offered in the form of a question posed by defense counsel—that contradicted Devarie's testimony; and, 2) denied counsel's request for a one or two week continuance to allow defense counsel time to secure Napoleone's attendance at trial. We disagree.

The relevant portion of defense counsel's cross-examination of Devarie is as follows:

[Defense counsel]: Did you ever read any newspaper articles about this case?

[Devarie]: Yes sir.

[Defense counsel]: Did you ever see any wanted posters?

[Devarie]: I didn't read it, they just showed me a clipping but I didn't look at it.

[Defense counsel]: Who showed you a clipping?

[Devarie]: [Napoleone], from the pharmacy in Hunt's Point.

[Defense counsel]: Did you read the clipping?

[Devarie]: No sir.

[Defense counsel]: You didn't read any facts about the case?

[Devarie]: No.

\*    \*    \*    \*    \*    \*

[Defense counsel]: Well at that point when you spoke to [Napoleone], you didn't believe that [Tirado] had done this, did you?

[Devarie]: Nope.

[Defense counsel]: So wouldn't you want to kind of read it to verify your thoughts or lack of thoughts or questions in your mind?

[Devarie]: Nope, because the second he told me about it, I believed it.

[Defense counsel]: The second that [Napoleone] told you about what?

[Devarie]: That [Tirado], when I first got to the pharmacy he told me, do you know about [Tirado] and I said yeah he's in jail and he said no, no, not that, about that he

killed a cop and I said oh and then he went to show me the clipping. I just looked and that was it.

Defense counsel proceeded to ask Devarie, "If I were to tell you that that man's name as we've discussed is [Napoleone] and that he denies that conversation ——[?]" After the State objected, defense counsel proffered that his co-counsel spoke with Napoleone and that Napoleone told him that he "never even heard of the whole incident until this morning." The court stated:

> I'll sustain the objection. Again ... if the predicate is that ... [Napoleone] ... said such and such, or takes a position as such and such I don't believe that's appropriate cross examination....

"Questions which assume facts not in evidence are objectionable, because a yes or no answer will be misleading.... Questions which assume the favorable resolution of facts as to which evidence has been admitted but which remain in dispute are also objectionable." 6 Lynn McLain, *Maryland Practice* § 611.5 (1987) (footnote omitted). The court did not abuse its discretion when it restricted defense counsel's cross-examination because it required that Devarie assume a fact—that Napoleone denied the conversation—not otherwise in evidence. In addition, the question posed by defense counsel was based on hearsay, and thus, irrespective of the reason that it assumed a fact not yet in evidence, was properly excluded. *See id.* § 802.1.

■ Tirado argues that he was entitled to a continuance because the State failed to "provide an address" for Devarie, he was otherwise unwilling to cooperate with defense counsel, and as a result defense counsel was unaware of the importance of Napoleone's testimony. As early as February 22, 1991, defense counsel knew that the State intended to call Devarie as a witness, and the State *did* provide defense counsel Devarie's address. Devarie's testimony— in which he explained that he didn't believe Tirado actually committed a murder until Napoleone talked to him—took place on July 9th and 10th, and co-counsel spoke with

Napoleone the morning of July 10th. Defense counsel sought a continuance on July 15th—five days after initially making contact with Napoleone, and near the close of the trial. Defense counsel conceded that the petition, which is necessary to compel Napoleone's attendance at trial, had not yet been filed in the New York courts. *See* Md.Cts. & Jud.Proc.Code Ann. § 9–303 (1989); *see also Breeden v. State*, 95 Md.App. 481, 622 A.2d 160 (1993). Thus, given the additional fact that defense counsel was made aware of the importance of Napoleone's testimony no later than July 10th, and still on July 15th had not filed the necessary petition to compel Napoleone's appearance, we conclude that defense counsel did not make a diligent effort to secure Napoleone's attendance. We hold that the court did not abuse its discretion when it denied Tirado's request for a continuance. *See Johnson v. State*, 237 Md. 283, 288, 206 A.2d 138 (1965).

## III.

Tirado maintains that the court erred when it admitted evidence of his past criminal conduct during the State's redirect examination of Devarie. When defense counsel asked what type of work Tirado had done since he left his prior employment (Tirado was a cadet at the police academy for a couple months), Devarie testified that he had done "nothing legal." Counsel then attempted to impeach Devarie's credibility by asking if he was involved with Tirado when he committed the illegal activities. On redirect, the State asked Devarie what Tirado did after the police academy, and Devarie replied, "Sell drugs and rob spots." Thus, Tirado suggests that defense counsel could not have "opened the door" to the State's subsequent inquiry since the State was not prejudiced by the testimony. Further, Tirado claims he was unfairly prejudiced by Devarie's testimony. We disagree.

"Redirect examination is restricted to the scope of the subjects addressed on cross-examination and rehabilitation

of the witness'[s] credibility after impeachment...." *See* McLain, *supra,* § 611.1; *see Mills v. State,* 12 Md.App. 449, 461, 279 A.2d 473, *cert. denied,* 263 Md. 717 (1971), *cert. denied,* 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 666 (1972) ("The trial judge's discretion in permitting inquiry on redirect is wide, particularly where the inquiry is directed toward developing facts made relevant during cross-examination or explaining away discrediting facts.").

Defense counsel *sub judice* questioned Devarie during cross-examination about Tirado's work history after leaving the police academy.

[Counsel]: What type of work or anything did he have?

[Devarie]: Work? Nothing legal.

[Counsel]: He didn't have any regular employment, you're saying? Is that correct?

[Devarie]: That's what nothing legal means.

[Counsel]: Are you saying he was involved in illegal things?

[Devarie]: Yes sir.

[Counsel]: Were you involved in illegal things?

[Devarie]: No sir.

[Counsel]: You didn't do anything illegal with him?

[Devarie]: No sir.

[Counsel]: You were never involved in anything illegal yourself?

[Devarie]: No sir.

[Counsel]: You've never been arrested?

[Devarie]: No sir.

[Counsel]: You've never been charged with anything?

[Devarie]: I've never been [sic] a courtroom, never been [sic] a precinct, never been in any kind of trouble.

On redirect, the State questioned Devarie regarding the subject covered during defense counsel's cross-examination—Tirado's work history after leaving the police academy and Devarie's relationship with Tirado. We conclude that the court was correct when it allowed the State to question Devarie about Tirado's prior illegal conduct since

defense counsel opened the door during cross-examination to such testimony. *See* McLain, *supra,* § 611.1. Devarie's specific testimony was in response to the same question previously asked by defense counsel. *See Tichnell v. State,* 287 Md. 695, 716, 415 A.2d 830 (1980) (party may waive objection to admissibility of evidence by allowing similar evidence to be admitted without objection, or by giving testimony which confirms the evidence objected to). Moreover, we find that the State properly sought during redirect to rehabilitate Devarie from any suggestion during cross-examination that he participated with Tirado in illegal activity. We hold that the evidence was properly admitted.

■ Even if evidence of other crimes committed by Tirado was improper, we conclude that the error, if any, was not prejudicial. *Cf. Ross v. State,* 276 Md. 664, 674, 350 A.2d 680 (1976); *Cook v. State,* 84 Md.App. 122, 131, 578 A.2d 283 (1990), *cert. denied,* 321 Md. 502, 583 A.2d 276 (1991). The court instructed the jury that:

> In this case [Devarie] testified and I permitted [him] to testify concerning certain prior conduct of [Tirado], ... which is not the subject of the charges in this case. Such evidence was allowed in this case solely on the issue of establishing [Devarie's] knowledge or lack of knowledge of [Tirado's] employment during a certain period of time and you're permitted to consider such evidence solely for that purpose. You may not consider such prior conduct, that is conduct which [Tirado] is not charged, as tending to show in any other way [his] guilt for the offenses for which he is now on trial.

The jury was directed to consider the testimony only as to Devarie's knowledge of Tirado's employment, or lack thereof, after he left the police academy. Further, the tainted evidence of Tirado's past illegal acts did not necessarily contribute to Tirado's conviction since there was evidence that Tirado himself boasted that he killed Corporal Wolf. Thus, we see no harmful effect as a result of the court's allowing the testimony. *But cf. Savoy v. State,* 64 Md.App. 241, 250–55, 494 A.2d 957 (1985) (error not harmless where

tainted evidence—that an officer previously arrested the defendant on drug charges—portrayed defendant as a "bad man" that may have "tilted balance" against him on a key issue—whether he fled an arrest or intentionally drove his car into the officer).

## IV.

■ Tirado next suggests that the court erred when it admitted, during cross-examination, Sergeant Coppinger's opinion that Tirado fired the fatal shots and that Devarie's testimony was consistent with the results of his investigation. Tirado claims the testimony was inadmissible hearsay, and that it improperly bolstered Devarie's testimony. We disagree.

On direct examination, defense counsel questioned Sergeant Coppinger regarding his investigation of Corporal Wolf's murder, and specifically why he chose not to preserve Devarie's statements. The following inquiry then ensued:

[Sergeant]: Well, for one, there weren't too many questions asked. I asked him what happened and he just went in a narrative in such detail and so to the point on what happened that—that I had no doubt in my mind that what he was telling me was correct.

[Defense counsel]: By this time, you had your—own theory as to what happened, isn't that correct?

[Sergeant]: There were a lot of theories of what happened and there's probably still a lot of theories as to what happened. I had all kinds of theories, I guess.

\* \* \* \* \* \*

[Defense counsel]: I'm—I'm asking. You had all kinds of theories as to who was the shooter, the person who fired the fatal shots?

[Sergeant]: No, I—I—I think I had it pretty well set in my mind since April 11th of 1990 who fired the fatal shot.

On cross-examination, the following colloquy between the State and Sergeant Coppinger ensued:

[State]: Sergeant Coppinger, who, in your mind, fired the fatal shot?

\* \* \* \* \* \*

[Sergeant Coppinger]: Eric Tirado, the Defendant seated at defense table in the black and gray sweater.

\* \* \* \* \* \*

[State]: Sergeant Coppinger, is the reason that there was no doubt in your mind that the information from Edgar Devarie was correct is that that information was consistent with the results of your investigation?

\* \* \* \* \*. \*

[Sergeant Coppinger]: It was.

We conclude that the State's inquiry on cross-examination was well within the scope of defense counsel's direct examination of the officer. *See* McLain, *supra,* § 611.1 ("Maryland follows the prevailing American practice of generally limiting cross-examination to the subject matter of the direct examination and matters affecting the credibility of the witness. Under this rule, counsel always may cross-examine an opponent's witness in order to impeach the witness, but is entitled to ask substantive questions on cross only in the course of further inquiry into the points brought up on that witness'[s] direct examination.").

Thus, the court did not abuse its discretion when it admitted the officer's opinion testimony into evidence. *See Winkles v. State,* 40 Md.App. 616, 622–23, 392 A.2d 1173 (1978), *cert. denied,* 284 Md. 751 (1979) (" '[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court and its action will seldom constitute a ground for reversal', notwithstanding that 'the court[ ] ... may be reversed if it is found[ ] ... [that] the trial court clearly abused its discretion.' "). Furthermore, the court allowed the testimony for the limited purpose of establishing *why the officer chose not to preserve Devarie's statement,* and not for its truth. Thus, the statement was not inadmissible hearsay.

Moreover, the jury may draw its own conclusion as to what, if any, weight to give the officer's testimony. *Id.* 40 Md.App. at 623, 392 A.2d 1173; *see also Oken v. State,* 327 Md. 628, 660, 612 A.2d 258 (1992). *But see Bohnert v. State,* 312 Md. 266, 278–79, 539 A.2d 657 (1988) (expert opinion of social worker in child sexual abuse case was erroneously admitted because it was "tantamount to a declaration ... that the child was telling the truth and that [the defendant] was lying."); *Cook,* 84 Md.App. at 138–44, 578 A.2d 283 (probative value outweighed by prejudice where officer rendered opinion essentially as to defendants' guilt and factual basis was weak).

## V.

■ Tirado further contends that the court erred when it admitted Special Agent Spauldings's expert opinion regarding the sequence of shots—that the shot to Corporal Wolf's mouth preceded the shot to the cheek. He claims that no adequate basis for his opinion was established because it was based upon the autopsy report of another expert, Dr. Kaplan. He insists that Special Agent Spaulding's testimony was prejudicial since it bolstered Devarie's testimony that Tirado told him the sequence of the shots he fired. We disagree.

During its case in chief, the State called F.B.I. Special Agent Spaulding, an expert in blood stain pattern analysis, to testify about the sequence of the shots fired. Defense counsel objected and argued that the State did not establish the basis for his opinion. The court allowed the question, but it also ruled that it would grant relief, if appropriate, after the witness responded to the question. The agent stated his opinion, and defense counsel renewed his objection. The court replied:

Well his basis for relying on that fact, I assume, is information he obtained from someone else. I don't know that. But he's also said from his assessment of the blood stains that he found in the area the [sic] he's concluded that the second shot would have suffered—would have

caused additional spattering and I'll overrule the objection, its [sic] in. I think he's sufficiently qualified to render an opinion. Its [sic] the subject of cross-examination.

"[A] trial judge is given broad discretion in ruling on the admissibility of expert testimony. Seldom will the decision in this regard constitute grounds for reversal." *Simmons v. State*, 313 Md. 33, 43, 542 A.2d 1258 (1988); *see also* McLain, *supra*, § 702.1 ("the standard for the admissibility of expert evidence is whether the finder of fact can receive appreciable help from an expert on the subject matter"). In the case *sub judice*, the court determined that Special Agent Spaulding relied on his own expertise, and not merely the autopsy report, when he gave his opinion as to the sequence of the shots. Special Agent Spaulding and Dr. Kaplan conferred in reaching their opinions, but the agent's opinion as to the sequence of the shots fired by Tirado was based on his independent assessment of the evidence, including the blood stains in the police vehicle. Indeed, when the witness was asked to explain the basis for his opinion, he responded:

The second shot would have caused a pistoning effect to some extent where blood would have been expelled from the mouth. Blood would have blown back toward the shooter from the second shot on the passenger's seat. This is also taken into consideration.

Nothing in the record warrants a conclusion that the court abused its discretion when it admitted the testimony into evidence. *See Simmons*, 313 Md. at 43, 542 A.2d 1258.

## VI.

Tirado next contends that Anderson's extrajudicial identification of Tirado was suggestive and unreliable. He asserts that the court erred when it denied counsel's motion to suppress the television identification and subsequent in-court identification. Tirado failed to show that Anderson's extrajudicial identification was the result of State action.

Anderson's identification of Tirado as the driver of the car took place gratuitously—he identified Tirado when he observed him on his television screen in his home. *See Brockington v. State,* 85 Md.App. 165, 173–74, 582 A.2d 568 (1990). Moreover, "[o]nce identification evidence is deemed admissible as a matter of law, its reliability becomes an issue of fact to be resolved by the jury. Any uncertainty expressed by a witness regarding his or her identification affects the weight placed on that evidence and not the issue of admissibility." *Barrow v. State,* 59 Md.App. 169, 186, 474 A.2d 967 (1984). Thus, the court was correct when it ruled that defense counsel's claim was without merit.

## VII. & VIII.

We address Tirado's next two contentions together; both involve the question of erroneous jury instructions.

Tirado complains that the court erred when it refused to incorporate his requested instructions on felony murder and robbery. Specifically, he argues that the court erroneously failed to: 1) elaborate on the "nexus" between felony murder and robbery; and, 2) instruct the jury that Tirado must have intended permanently to deprive Corporal Wolf of the ticket book rather than to facilitate an escape. We disagree.

### *Felony Murder*

Rule 4–325(c) provides:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. *The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.*

(Emphasis added).

In the case *sub judice,* the court instructed the jury that:

In order to convict the defendant of first degree felony murder, the state must prove, one, that the defendant or another individual participating in the crime with the defendant committed a robbery[,] ... secondly that the defendant or another individual participating in the crime killed Corporal Wolf, and third that the act resulting in the death of Corporal Wolf occurred during the commission of the robbery. Felony murder does not require the state to prove that the defendant intended to kill the victim.

Defense counsel requested the court to instruct the jury that:

[i]f you find that Francisco Rodriguez murdered Corporal Wolf prior to and independent of any acts and intentions of Mr. Tirado to aid and abet Mr. Rodriguez in the taking of the ticket book to conceal the murder, you may not convict Mr. Tirado of murder. Then to clarify, in other words, this is an alternative instruction we asked for. In other words if you're not convinced beyond a reasonable doubt that Eric Tirado murdered Corporal Wolf, and you believe that Francisco Rodriguez murdered Corporal Wolf and that Eric Tirado did not aid or abet him that the murder did not take place during a planned robbery scheme, then you must find Eric Tirado not guilty of murder.

The court's instruction fairly covered Tirado's requested instruction on the "nexus" requirement. *See* Rule 4–325(c). The court's instruction mirrors the pattern jury instruction on felony murder. *See Maryland Criminal Pattern Jury Instruction* 4:17.7 (1991).

### Robbery

The court instructed the jury:

In order to convict the defendant of robbery with a dangerous weapon, the state must prove ... the taking ... and carrying away of property from someone else or from that person's presence and control and its [sic] a taking by force or threat of force with the intent to steal

the property.... [T]he state must prove, one, that the defendant took the property from the victim, in this case Trooper Wolf is alleged, two, that the defendant took the property by force or threat of force, three, that the defendant intended to steal the property, that is to *deprive the owner or the victim of the property permanently,* and, four, that the defendant committed the robbery by using a dangerous weapon. For a robbery to occur there must be a taking and a removal with the *intent to permanently deprive the owner* of the property....

Tirado requested the court to instruct the jury that: [I]f the jury finds that when Eric Tirado and/or Francisco Rodriguez removed Corporal Wolf's ticket book from his police vehicle that they merely intended [to remove] evidence of their identity from the scene of a prior crime and the verdict should be not guilty of robbery.

The instruction given by the court was identical to the pattern jury instruction on robbery with a dangerous weapon. *See id.* 4:28, 4:28.1. Again, the court's instruction fairly covered Tirado's requested instruction with respect to the question of intent. Thus, we perceive no error with either instruction.

## IX.

Tirado finally argues that the court's cumulative errors require reversal. Our disposition of each of the alleged cumulative errors makes it unnecessary for us to address this issue.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.